# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PRO MUSIC RIGHTS, LLC, | Civil Action No. 3:20-cv-00309 |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| APPLE, INC., AMAZON.COM, INC., GOOGLE, LLC, YOUTUBE, LLC, SPOTIFY AB, SPOTIFY USA, INC., SPOTIFY LIMITED, SPOTIFY TECHNOLOGY S.A., DIGITAL MEDIA ASSOCIATION, NATIONAL RELIGIOUS BROADCASTERS MUSIC LICENSE COMMITTEE, RADIO MUSIC LICENSE COMMITTEE, INC., THE NATIONAL ASSOCIATION OF AMERICAN WINERIES, TELEVISION MUSIC LICENSE COMMITTEE, LLC, 7DIGITAL GROUP, INC., 7DIGITAL, INC., 7DIGITAL GROUP PLC, 7DIGITAL LIMITED, DEEZER, S.A., DEEZER INC., IHEARTMEDIA, INC., CONNOISSEUR MEDIA LLC, PANDORA MEDIA, LLC, RHAPSODY INTERNATIONAL, INC., SOUNDCLOUD LIMITED, and SOUNDCLOUD INC., | |
| Defendants. | March 9, 2020 |

## COMPLAINT

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**TABLE OF CONTENTS**

I.   NATURE OF ACTION .................................................................................. 1

II.  JURISDICTION AND VENUE ..................................................................... 8

III. PARTIES ....................................................................................................... 9

   A.   PRO MUSIC RIGHTS, LLC ................................................................ 9
   B.   APPLE, INC. ...................................................................................... 11
   C.   AMAZON.COM, INC. ......................................................................... 12
   D.   GOOGLE, LLC ................................................................................... 13
   E.   YOUTUBE, LLC ................................................................................ 15
   F.   SPOTIFY DEFENDANTS .................................................................... 16
   G.   DIGITAL MEDIA ASSOCIATION ....................................................... 17
   H.   NATIONAL RELIGIOUS BROADCASTERS MUSIC LICENSE COMMITTEE ......................... 18
   I.   RADIO MUSIC LICENSING COMMITTEE, INC. ................................. 19
   J.   TELEVISION MUSIC LICENSE COMMITTEE, LLC ............................ 19
   K.   THE NATIONAL ASSOCIATION OF AMERICAN WINERIES ............... 20
   L.   7DIGITAL DEFENDANTS ................................................................... 21
   M.   DEEZER DEFENDANTS ...................................................................... 23
   N.   IHEARTMEDIA, INC. ......................................................................... 24
   O.   CONNOISSEUR MEDIA LLC .............................................................. 25
   P.   PANDORA ........................................................................................... 25
   Q.   RHAPSODY ......................................................................................... 26
   R.   SOUNDCLOUD DEFENDANTS ............................................................ 27
   S.   ANTITRUST CO-CONSPIRATORS ....................................................... 28
   T.   VICARIOUS CONDUCT ....................................................................... 29
   U.   GROUPINGS ....................................................................................... 29

IV.  BACKGROUND FACTS .............................................................................. 29

   A.   WHAT IS A MONOPSONY? ................................................................. 29
   B.   THE LICENSING OF COPYRIGHTED MUSIC ...................................... 30
   C.   THE STRUCTURE OF THE PERFORMANCE RIGHTS MARKET ............ 31
   D.   THE SELL-SIDE OF THE PERFORMANCE RIGHTS MARKET ............... 32
        i.    BMI AND ASCAP .................................................................. 32
        ii.   SESAC ................................................................................... 33
        iii.  GMR ...................................................................................... 33
   E.   THE BUY-SIDE OF THE PERFORMANCE RIGHTS MARKET ............... 34
        i.    Streaming Defendants ........................................................... 34
        ii.   iHeartMedia and Connoisseur Media ................................... 35
        iii.  RMLC ................................................................................... 35
        iv.   TVMLC ................................................................................. 39
        v.    NRBMLC ............................................................................... 42
   F.   THE CARTEL REFUSES TO DEAL WITH PMR .................................. 45

V.   THE CARTEL'S UNLAWFUL AND ANTICOMPETITIVE ACTIVITIES ...................... 47

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

A.   THE CARTEL'S PURPOSE AND MOTIVATION OF THE ANTICOMPETITIVE AGREEMENT ..... 48
B.   THE MIC COALITION .................................................................. 58
C.   CARTEL ENGAGES IN A CAMPAIGN TO COMMUNICATE FALSEHOODS TO MEMBERS ....... 61
D.   THE CARTEL HAS SUBSTANTIAL OPPORTUNITIES TO COMMUNICATE AND COLLUDE ..... 63
E.   ANTI-COMPETITIVE NEGOTIATIONS WITH PMR .......................................... 64
F.   REFUSAL TO DEAL ..................................................................... 65
G.   GROUP BOYCOTT ...................................................................... 65
H.   THE END-USER LISTENERS WILL NOT BE HARMED ...................................... 66

VI.   EFFECT OF THE CARTEL'S HORIZONTAL CONSPIRACIES ................................. 66

A.   INJURY TO COMPETITION ............................................................... 66
B.   RESTRICTED SONGWRITER AND PUBLISHER CHOICE .................................... 67
C.   RESTRICTED CONSUMER CHOICE ....................................................... 67
D.   ANTITRUST INJURY TO PMR ............................................................ 68

VII.   CONSPIRACY TO MONOPSONIZE ...................................................... 69

VIII.   MAINTENANCE OF MONOPSONY BY EXCLUSIONARY PRACTICES ................. 69

IX.   CAUSES OF ACTION ................................................................... 70

JURY DEMAND .............................................................................. 107

PRAYER FOR RELIEF ........................................................................ 107

SCHEDULE 1 ............................................................................... S-1

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**GORA LLC**
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

Plaintiff, Pro Music Rights, LLC ("**PMR**" or "**Plaintiff**"), through its counsel, Gora LLC, files this Complaint against Defendants Apple, Inc., Amazon.com, Inc., Google, LLC, YouTube, LLC, Spotify AB, Spotify USA, Inc., Spotify Limited, Spotify Technology S.A., Digital Media Association, National Religious Broadcasters Music License Committee, Radio Music Licensing Committee, Inc., The National Association of American Wineries, Television Music License Committee, LLC, 7Digital Group, Inc., 7Digital, Inc., 7Digital Group PLC, 7Digital Limited, Deezer, S.A., Deezer, Inc., iHeartMedia, Inc., Connoisseur Media LLC, Rhapsody International, Inc., SoundCloud Limited, and SoundCloud Inc. alleging violations of the Sherman Act, 15 U.S.C. §§ 1 and 2, the Connecticut Antitrust Act and the Connecticut Unfair Trade Practices Act.

## I.    NATURE OF ACTION

1.    PMR entered the performance rights licensing market to provide a modern alternative to copyright holders, who are the writers, composers and publishers creating the musical works played on the radio, television and music streaming services. Unlike other performance rights organizations ("**PROs**"), which pay royalties for public performances of musical works based on some formula or some royalty pool, PMR pays the entirety of such royalty to the copyright holder. For its services, PMR charges buyers a reasonable, periodic fee for the license to publicly perform musical works. PMR's competitive advantage is providing better services to writers, composers and publishers of musical works, particularly those just entering the industry without mainstream audiences.

2.    Despite PMR's substantial effort and investment to accumulate musical works in its repertory, Defendants have entered into an illegal agreement, combination and/or conspiracy to shut PMR out of the market and to fix prices at infracompetitive levels. They have choreographed a refusal, and continuous refusal, to deal with PMR. No television station, radio station or music

streaming service has entered into a license to perform the musical works in PMR's repertory, let alone engaged in any substantive negotiations therefor.

3.      Defendants are not acting in a manner consistent with their respective, individual self-interest. Instead, each Defendant is motivated to maintain, and does maintain, the conspiracy in the buy-side of the market to the detriment of its independent economic interest. Defendants' conspiracy has been, and is, successful because Defendants have complete control of the buyers' market for a license to publicly perform musical works (the "**License**").

4.      The Defendants' conspiracy and anticompetitive agreement is an illegal monopsony. By conspiring to boycott PMR and to set the price for a License at infracompetitive levels, Defendants have destroyed competition between and among themselves. As a result, they have generated explosive growth in revenue, profits, and goodwill to PMR's detriment. With their monopsony intact, Defendants have become the conspiratorial stewards of the buy-side of the market that will not deal with PMR, will take whatever means necessary to prevent new PROs from entering or growing a business, and will not enter into License agreements except at an illegal price.

5.      PMR, as the newest entrant into the market, has flown under the radar to accumulate both whole and fractional rights to a substantial number of popular and less-than popular musical works. For those musical works to which PMR has fractional rights, another PRO may hold the balance of the rights. Compared to the number of musical works in the other PROs' repertoire, PMR has the third-largest supply in the market. As the third-largest supplier, PMR expected to enter into at least *one* License agreement with at least *one* of the Defendants, as the other PROs have done. To PMR's surprise, all of the Defendants with whom PMR actively tried to negotiate

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

a License uniformly refused to deal with PMR. In explaining why, the Defendants peddled nearly-verbatim excuses and language to PMR.

6.      Without a License from PMR, Defendants' insolence only got worse. All of the Defendants continued to publicly perform PMR's repertory. All of the Defendants knew they did not have a License to do so. All of them did so while knowing about their liability for copyright infringement. Shocked, PMR did what every other PRO would do upon learning of such willful copyright infringement, it double-downed on its efforts to secure a License agreement from various Defendants.

7.      Sticking to their illegal agreement, however, Defendants lobbed the same excuses at PMR, such as, for example, that a License for PMR's musical works is not necessary or PMR's repertory is not available online. PMR's repertory was, and remains, prominently featured and available for search and download on its website, including for more than one search term at a time. Faced with no other choice, PMR filed lawsuits against various Defendants seeking statutory damages for their willful copyright infringement.

8.      From its extensive efforts to License its repertory to nearly all the Defendants and certain of their co-conspirators, PMR has learned that Defendants have, for years now, been relentlessly carrying out their illegal agreement to choke all vestiges of legitimate competition from the buy-side of the market. They have deployed several tools against PROs to maintain their monopsony, including by taking turns to lodge antitrust claims against any PRO having, as some Defendants describe it, a "must-have" repertory and reducing demand in the market (which, in turn, reduces sell-side outputs—there are fewer musical works for public consumption).

9.      That is why Global Music Rights, LLC ("**GMR**") and SESAC LLC ("**SESAC**"), PMR's competitors, were sued for engaging in allegedly anticompetitive conduct. Defendants are

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

now putting PMR through their wringer by uniformly refusing to enter into a License with it despite using the musical works in its repertory. In trying to legitimize their monopsony, one Defendant says, PMR "appears to be following the anticompetitive playbook established by SESAC." That is false; PMR is trying to build a business in a market that the Defendants have rigged and continue to rig.

10.     They uniformly and publicly vilify the PROs and their respective business practices with strategic propaganda aimed at music listeners, customers, regulators, courts and other market participants. Defendants have sustained and exploited their conspiracy due to the multi-billion-dollar market's unique characteristics:

a.     *First*, the two largest PROs, which in the aggregate control over 90% of the Licenses, have been subject to consent decrees for nearly eighty years, since the 1940s (generally, the "**consent decrees**"). Defendants brandish those consent decrees at every turn to cast every PRO, new or old, as a villain on the unbelievable theory that having one musical work renders such PRO a monopolist.

b.     *Second*, Defendants cannot lawfully publicly perform copyrighted musical works without License. Doing so results in copyright infringement. Worse yet, willful copyright infringement is remedied with statutory damages and also punishable by up to ten years in prison. While Defendants publicly say (as they must) they respect performance rights, they then cavalierly infringe PMR's works without License and without paying royalties. Then, when PMR's copyright holders hear their works on television, radio or online, they ask PMR for royalty payments. But, no royalty payments are forthcoming because Defendants refuse to deal with and have not paid PMR. Then, PMR is forced to file a copyright infringement lawsuit, as it has done, against those Defendants.

c.     *Third*, copyright holders have traditionally conferred administration and licensing of their respective musical works to the sell-side of the market: (i) PMR, (ii) GMR, (iii) SESAC, (iv) American Society of Composers, Authors, and Publishers ("**ASCAP**") and (v) Broadcast Music, Inc. ("**BMI**"). Those PROs control, in the aggregate, virtually all of the PRO sell-side of the market. Under their conspiracy, Defendants have not refused to deal with BMI and ASCAP because those PROs license over 90% of the public performance rights administered by the PROs. Since the rules with BMI and ASCAP are set under the consent decrees, Defendants act against their self-interest in refusing to deal with PMR, as they have done with other PROs entering the market before PMR, such as SESAC and GMR.

d.     *Fourth*, the Defendants' historical context of the industry focuses on allegedly anticompetitive conduct by the sell-side of the market, mainly against BMI and ASCAP. More recently, they have focused and continue to focus on antitrust lawsuits against PMR's other competitors: SESAC and GMR. In their never-ending strategy to maintain a narrative that every PRO is a monopolist so long as such PRO has at least one musical work, Defendants have averted scrutiny by falsely painting themselves as the perpetual victim in a market run by, in their words, monopolist PROs.

e.     *Fifth*, the Defendants publicly communicate the purpose of their illegal agreement: eviscerate PMR from the market. One Defendant has explicitly stated, PMR and GMR should not "exist alongside ASCAP and BMI" because each "distorts competition." Defendants then direct that no buyer conduct any business with PMR because if "composers and music publishers" move their rights to "an unregulated PRO," such as PMR, then it "can offer to pay [its] affiliated composers and publishers at higher levels" and then the Defendants lose "the protections afforded . . . by the Consent Decrees[.]" These public statements illustrate that the Defendants'

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

conspiracy mandates no Licenses or payments be made when a new PRO (such as PMR) accumulates musical works in its repertory (as PMR has done).

   f. *Sixth*, Defendants' motivation to cease PMR's and "other unregulated PROs'" existence "alongside ASCAP and BMI" is for the deliberate purpose to maintain, at all costs, the "two-stop shopping" at the repertoire-stores of BMI and ASCAP. One Defendants says, "Rather than secure all of the rights necessary to publicly perform music through two-stop shopping, and under conditions in which the potential for abuse of market power is mitigated, music users [i.e., the Defendants] need to secure licenses from every [new] PRO that has become sufficiently large such that using its music is unavailable."

   g. *Seventh*, Defendants are doing all they can to avoid fractionalizing performance rights in musical works. By maintaining "two-stop shopping," Defendants need to obtain only two Licenses, one from BMI and one from ASCAP. Whenever a new PRO enters the market, such as SESAC, GMR and PMR, Defendants are subject to an additional cost, which occurs when, as here, PMR administers a License for a fractional right in a musical work, the remainder of which is administered by another PRO. With that result, each Defendant must obtain another License.

  11. Defendants have unlawfully exploited the uniqueness of the buy-side market. With the consent decrees setting the rules of the game for BMI and ASCAP, the Defendants have virtually pinpoint clarity in how BMI and ASCAP must operate in the market. For instance, if Defendants take issue with BMI's or ASCAP's prices or price increases, they initiate litigation in the "rate court" venued in the United States District Court for the Southern District of New York (generally, the "**rate court**"). Years of litigation and millions of dollars later, the rate court supposedly "resolves" the dispute by setting the "price" of the License. While Defendants tout the

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 •TRUMBULL, CT •06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

resulting decision as "reasonable," "nondiscriminatory" and establishing the fair market value for a License, the decision does not reflect the price at which a willing seller would sell, or a willing buyer would buy, a License. That is because the Defendants have rigged the data set, including the price, on which the analysis and decision is based. In other words, the rate court's decisions have not accounted for the Defendants' market-distorting power or other relevant market data.

12.     PMR, GMR and SESAC are not subject to the consent decrees. Any PRO not subject to a consent decree is disparaged by the Defendants, saying each such PRO is engaged in anticompetitive conduct. Furthermore, in August 2019, matching their actions with their words, Defendants Radio Music Licensing Committee, Inc. ("**RMLC**") and Digital Media Association ("**DiMA**") publicly refused to acknowledge any PRO other than BMI and ASCAP as a "legitimate" sell-side competitor.

13.     Defendants' position is hardly surprising. If Defendants acknowledge the legitimacy of another PRO, it would render the consent orders unnecessary and songwriters, composers and publishers might move *en masse* to PMR.

14.     To ensure the viability of the consent orders, Defendants downplay new PROs, construct unlawful and substantial barriers to enter the market, and do all they can, regardless of legality, to block redistribution of market share. It is undeniable that the market has transformed with the advent of the Internet. The concerns giving rise to the consent decrees are ceasing, or have already ceased, to exist.

15.     Against this backdrop, the Defendants unlawfully agreed to act in unison, collectively and collaboratively as a buyers' cartel (the "**Cartel**"), throwing their individualized self-interest into the wind, for the long term gain of the "two-stop shopping."

16.     The unlawful purpose of the Cartel is two-fold: fight to preserve the BMI and ASCAP duopoly and make PMR (and any other new PRO) cease to exist. If PMR continues to exist, the Cartel deploys its backup strategy: "a take-it-or-leave-it," feigned negotiation where the Cartel will only buy a License at a price that will result in PMR's giving up or shutting down. That is precisely what Defendants had attempted to do with GMR and SESAC, and what RMLC is presently doing with its antitrust lawsuit against GMR. As the newest PRO, with more musical works than GMR and SESAC combined, PMR is battling for its existence against the Cartel.

17.     Yet, PMR has not sat idly waiting for the Cartel to negotiate with it. Despite several rounds of letters, emails, conference calls and other communications with various Defendants, the Cartel has maintained their course, executing on their illegal agreement to boycott PMR. PMR has been unable to secure any License from any member of the Cartel over the course of the past 2 years. As a participant in the market unlawfully restrained, controlled and rigged by the Cartel, PMR has suffered an injury of the type that the antitrust laws were intended to prevent.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 1 and 26 and 28 U.S.C. § §1331 and 1337. This Court also has jurisdiction over the state law claims under 28 U.S.C. §1367, because those claims are so related to the federal claims that they form part of the same case or controversy.

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b), (c) and (d) as well as 15 U.S.C. § 22 because (1) the Defendants resided, transacted business, were found or had agents in this judicial district; (2) a substantial part of the events or omissions giving rise to these claims occurred in this judicial district; (3) a substantial portion of the interstate trade and

commerce discussed herein was carried out in this judicial district; or (4) they have engaged in anticompetitive and illegal conduct that has had an impact in this judicial district.

20.     Defendants, directly or indirectly, singly and in concert, made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate and/or international commerce in connection with the unlawful acts and practices and courses of business alleged in this Complaint.

21.     According to the nationwide contacts test provided for by 15 U.S.C. §22, all Defendants are subject to personal jurisdiction in the United States because they, as set forth below, were formed in or have their principal places of business in the United States. All Defendants transact business in this judicial district. Additionally, all members of the conspiracy are subject to personal jurisdiction in the United States because the conspiracy was directed at, carried out in substantial part in, effectuated in whole or in part, or had the intended effect of, causing injury to Plaintiff, who resided in and did business in the United States.

22.     This Court has personal jurisdiction over the parties because all Defendants (i) conducted business throughout the United States, including in the District of Connecticut; (ii) had substantial contacts with the District of Connecticut; and (iii) engaged in a campaign of price-fixing and boycott that has affected a nationwide market for the license of copyrighted musical works, which market includes the District of Connecticut.

## III.     PARTIES

### A.     Pro Music Rights, LLC

23.     PMR is a limited liability company organized and existing under the laws of Florida with its principal place of business at 3811 Airport Pulling, STE 203, Naples, Florida 34105.  PMR was founded in January 2018 by Jake Noch ("**Noch**"), its chief executive officer.  PMR's

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

executives and representatives are experts in the market, the licensing industry, and the business model of PROs. PMR is a PRO that collects license fees on behalf of songwriters, composers and music publishers with whom it is affiliated and then distributes the license fees as royalties to those affiliates whose works have been publicly performed.

24. It is the fifth-ever formed public PRO in the United States behind the ASCAP, BMI, SESAC and GMR, and it controls an estimated 7.4% market share of the public performance rights in the United States based on the number of works in its repertory (the "**PMR Repertory**"), including works by notable artists such as A$AP Rocky, Wiz Khalifa, Pharrell, Young Jeezy, Juelz Santana, Lil Yachty, MoneyBaggYo, Larry June, Trae Pound, Sause Walka, Trae Tha Truth, Sosamann, Soulja Boy, Lex Luger, Lud Foe, SlowBucks, Gunplay, OG Maco, Rich The Kid, Fat Trel, Young Scooter, Nipsey Hussle, Famous Dex, Boosie Badazz, Shy Glizzy, 2 Chainz, Migos, Gucci Mane, Young Dolph, Trinidad James and Fall Out Boy. Most of the musical works in the PMR Repertory have only one copyright holder. PMR has many reputable artists in its cache including, OG Maco, best known for his 2014 debut single "U Guessed It," which went viral and peaked at number 90 on the U.S. Billboard Hot 100.

25. The musical works in PMR's Repertory are quality works in various genres. Some of those musical works have generated royalties when licensed through BMI or ASCAP, each of which ultimately paid the copyright holder because of a License from the respective Defendant. Yet, when such copyright holder leaves BMI or ASCAP for PMR, the revenue stops, meaning while a Defendant had a license to play, had played, and had paid performance royalties for such musical work when housed at BMI or ASCAP, a Defendant no longer has a license when such copyright holder leaves for PMR—a license from another PRO does not translate into a license with PMR.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

26.     The musical works in PMR's Repertory have been publicly performed hundreds of millions of times and have generated performance royalties in the hundreds of thousands of dollars. Any administrative or legal expenses to negotiate a License with PMR is substantially outweighed by the benefit of having a License and not having infringement liability.

27.     Additionally, PMR partnered with Cosynd, a New York-based legal service that automates copyright contracts and registrations. The partnership allows PMR artists to create contracts (split sheets, premium split sheets, work for hire agreements, and producer agreements) that secure copyrights and registrations with the U.S. Copyright Office. Songwriters, composers and publishers can submit applications to register their musical works in a matter of minutes. In a later phase of the partnership, Cosynd's API will integrate directly with PMR's dashboard for further management of musical works and relationships by PMR's songwriters, composers and publishers.

**B.      Apple, Inc.**

28.     Upon information and belief, Defendant Apple, Inc. is a for-profit California corporation having its principal place of business located at 1 Infinite Loop, Cupertino, California, and maintaining corporate offices in New York, New York. Apple also has numerous locations throughout the United States, including 7 Apple retail stores in Connecticut collectively employing between 500 – 1,000 Connecticut residents.

29.     Apple owns, maintains and operates Apple Music, a music and video streaming service. Users select music to stream to their device on-demand, or they can listen to existing, curated playlists. Apple's streaming service touts around 45 million songs and has approximately 60 million monthly subscribers worldwide. It is the most popular paid streaming service in the United States, beating out Spotify and other music streaming services.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

30.     Apple provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

31.     Upon information and belief, Apple has thousands of registered subscription-based users and free-based users in Connecticut.

32.     The musical works in PMR's Repertory have been streamed through Apple's service in Connecticut to end-user listeners in Connecticut.

33.     In addition to employing Connecticut residents in its Apple Stores, Apple advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

34.     Apple has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. Apple's conduct in this judicial district has caused substantial harm to PMR.

**C.     Amazon.com, Inc.**

35.     Upon information and belief, Defendant Amazon.com, Inc. is a for-profit corporation organized under the laws of the State of Delaware, with its principal place of business in Seattle Washington, and maintaining corporate offices in New York, New York. Amazon also has numerous facilities located in Connecticut which employ thousands of Connecticut residents.

36.     Amazon Music is a music and video streaming service developed, owned and operated by Amazon.

37.     Amazon provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

38.     Upon information and belief, Amazon has thousands of registered subscription-based users and free-based users in Connecticut.

39.     The musical works in PMR's Repertory have been streamed through Amazon's service in Connecticut to end-user listeners in Connecticut.

40.     In addition to employing Connecticut residents in its facilities, Amazon advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

41.     Amazon has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. Amazon's conduct in this judicial district has caused substantial harm to PMR.

**D.     Google, LLC**

42.     Upon information and belief, Defendant Google, LLC is a for-profit, limited liability company organized under the laws of the State of Delaware, with its principal place of business in Mountain View, California, and maintaining corporate offices in New York, New York. Also, Google is registered as a foreign limited liability company operating in Connecticut,

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

and it may be served with process care of Corporation Service Company, 50 Weston St., Hartford, CT 06120.

43.     Google Play Music is a music and video streaming service developed, owned and operated by Google.

44.     Google provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

45.     Upon information and belief, Google has thousands of registered subscription-based users and free-based users in Connecticut.

46.     The musical works in PMR's Repertory have been streamed through Google's service in Connecticut to end-user listeners in Connecticut.

47.     Google advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

48.     Google has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in and from Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. Google's conduct in this judicial district has caused substantial harm to PMR.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**E.**      **YouTube, LLC**

49.      Upon information and belief, Defendant YouTube, LLC is a for-profit limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Mountain View, California.

50.      YouTube Music is a music and video streaming service developed and operated by YouTube.

51.      YouTube provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

52.      Upon information and belief, YouTube has thousands of registered subscription-based users and free-based users in Connecticut.

53.      The musical works involved in this action have been streamed through YouTube's service in Connecticut to end-user listeners in Connecticut.

54.      YouTube advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

55.      YouTube has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. YouTube's conduct in this judicial district has caused substantial harm to PMR.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

### F.   Spotify Defendants

56.     Upon information and belief, Defendant Spotify Technology S.A. is a business entity incorporated in Luxembourg, having its principal place of business at Avenue Marie-Therese 22, 2132 Luxembourg, Luxembourg.

57.     Upon information and belief, Defendant Spotify Limited is a Private Limited Company organized under the laws of the United Kingdom, having its principal place of business at Golden House, 30 Great Pulteney Street, London W1F 9NN, United Kingdom. Upon information and belief, Spotify Limited is a wholly-owned subsidiary of Spotify Technology SA.

58.     Upon information and belief, Defendant Spotify AB, is a Swedish corporation with its principal place of business at Birger Jarlsgatan 61, 4tr 113 56 Stockholm, Sweden. Upon information and belief, Spotify AB is a wholly-owned subsidiary of Spotify Limited.

59.     Upon information and belief, Defendant Spotify USA, Inc., is, inter alia, a Delaware corporation engaged in online music distribution with its headquarters located at 4 World Trade Center, 150 Greenwich Street, 62nd Floor, New York, New York. Upon information and belief, Spotify USA, Inc., is a wholly-owned subsidiary of Spotify Limited.

60.     At all relevant times, each of Defendant Spotify Technology S.A., Spotify USA, Inc., Spotify AB and Spotify Limited (collectively, "**Spotify**"), and their respective representatives, conspired with, and acted as agents on behalf of and for, the other defendants concerning the actions and inactions alleged in this Complaint. Spotify touts itself as the largest global music streaming service. With a presence in 61 countries and territories and growing, its platform includes 159 million monthly active users and 71 million premium subscribers, as of December 31, 2017.

61.     Spotify provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

62.     Upon information and belief, Spotify has thousands of registered subscription-based users and free-based users in Connecticut.

63.     The musical works involved in this action have been streamed through Spotify's service in Connecticut to end-user listeners in Connecticut.

64.     Spotify advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

65.     Spotify has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. Spotify's conduct in this judicial district has caused substantial harm to PMR.

**G.     Digital Media Association**

66.     Defendant Digital Media Association represents webcasters, online media, music streaming services, and technology innovators.

67.     DiMA says it represents its approximately 25 members in industry negotiations for public performance licenses, rate-setting proceedings and other affairs to "ensure their success worldwide," with such members including Amazon, Apple, Google, Live365, Microsoft, MTV Networks, Nokia, Motorola, Rhapsody, Pandora, Slacker, Spacial Audio Solutions, Spotify, and YouTube.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

68.     DiMA has been instrumental in maintaining BMI's and ASCAP's market dominance. In 2014, it admitted, "Without the presence of the Consent Decrees, ASCAP and BMI would not have been able to retain and trade on their significant market power, in turn, citing their dominance as a lure for potential music publisher and songwriter affiliates," and continuing, "Absent the Consent Decrees, in a more truly-competitive market for music work performance rights (i.e. a market consisting of multiple competitors of relatively equal bargaining power), ASCAP and BMI would likely not have been able to achieve the prolific increase in revenues that they managed under the Consent Decrees."

69.     Also, DiMA has admitted that the "music industry has been transformed by digital technology."

### H.     National Religious Broadcasters Music License Committee

70.     Defendant National Religious Broadcasters Music License Committee ("**NRBMLC**") represents well over 1,000 full-power AM and FM radio stations in the United States and its territories in music licensing affairs with its principal place of business at 4880 Santa Rosa Road, Camarillo, CA 93012.

71.     NRBMLC originally was formed in 1985 to provide a more focused negotiating effort on behalf of religious-formatted stations.

72.     NRBMLC has, in recent years, undertaken proceedings to achieve performance licenses for music streaming services, and tells its members, "If you do not authorize the NRBMLC to represent you for music licensing proceedings, you will automatically be licensed by ASCAP, etc. under the terms negotiated by the Radio Music License Committee (the "RMLC")."

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**I.**     **Radio Music Licensing Committee, Inc.**

73.     Defendant Radio Music Licensing Committee, Inc. serves as the negotiating arm for the entire commercial radio industry.

74.     It claims to be a not-for-profit corporation with its principal place of business at 1616 Westgate Circle, Brentwood, Tennessee 37027.

75.     It represents the interests of the commercial radio industry (over 10,000 commercial radio stations and their approximately 3,000 owners) on public performance licensing matters.

76.     The RMLC's radio station constituents comprise more than 90% of the U.S. terrestrial radio industry.

**J.**     **Television Music License Committee, LLC**

77.     Defendant Television Music License Committee, LLC ("**TVMLC**") is a non-profit trade association with its principal place of business at 1483 York Avenue, #20623, New York, NY 10075, funded by voluntary contributions from its television stations.  TVMLC represents the collective interest of some 1,200 full-power, commercial television stations in the United States and its territories in negotiations for music performing rights licenses that stations sign with the two largest PROs - ASCAP and BMI.

78.     Through the settlement of a lawsuit filed by some broadcasters and funded by TVMLC, SESAC agreed to negotiate industry-wide licenses with TVMLC through 2035.

79.     TVMLC designs the method of allocating industry-wide fees among all of the stations licensed by ASCAP, BMI and SESAC (the vast majority of local television stations), subject to the agreement with the PRO or court approval, which TVMLC uses to calculate the fees billed to each individual station.  After television stations sign their individual agreements with

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

the PRO, TVMLC remains active to resolve problems between its television stations and the respective PRO.  TVMLC states, "We are the station's advocate."

80.    The TVMLC has assisted the local television industry in bringing federal "rate court" litigation against BMI and ASCAP as well as purporting to maximize the opportunities for local television stations to secure musical works public performance rights.

### K.    The National Association of American Wineries

81.    Defendant The National Association of American Wineries ("**WineAmerica**") is the only national wine industry association in the United States with its principal place of business at 818 Connecticut Avenue NW #1006, Washington, DC 20006. It is a 500-member strong organization that encourages the growth and development of American wineries and winegrowing through the advancement and advocacy of sound public policy.

82.    It says, it "represents wineries and vineyards in 46 states" with, upon information and belief, negotiations to secure musical works public performance rights. It directs its members to contact WineAmerica when a member is "experiencing continued difficulties with a PRO" as "WineAmerica can help assist resolve disputes between wineries and a PRO." It also "believes that fractionalized licensing would have eliminated buyer's choice in the marketplace, encourage anti-competitive behavior, and ultimately raise the cost of performing music."

83.    Worse yet, it also directs its members to "Play music by songwriters from one PRO only" and discuss with your lawyer when "you are being pursued by a PRO for reasons that you consider unnecessary[.]"

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

L.      **7digital Defendants**

84.      Defendant 7digital Group, Inc., is a Delaware corporation with its principal place of business in San Francisco, California, and can be served with process care of Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, DE, 19904.

85.      Defendant 7digital, Inc., is a Delaware corporation with its principal place of business in San Francisco, California, and can be served with process care of Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, DE, 19904.

86.      Defendant 7digital Group PLC is a United Kingdom Public Limited Company with its principal place of business in the United Kingdom, and can be served with process at 69 Wilson Street, London, EC2A 2BB. It also has a main office in the United States located at 580 Howard Street, Suite 301, San Francisco, California 94105. Upon information and belief, Defendant 7digital Group PLC currently has nine officers and the majority of them list correspondence address as 69 Wilson Street, London, EC2A 2BB, other addresses include 100 Potrero Avenue, San Francisco, CA 94103, United States and 17 Sutherland Place, London, W2 5BZ.

87.      Defendants 7digital Limited is a United Kingdom Private Limited Company with its principal place of business in the United Kingdom, and can be served with process at 69 Wilson Street, London, EC2A 2BB. Upon information and belief, 7digital Limited was incorporated on July 24, 2003. Defendant also has a main office in the United States located at 580 Howard Street, Suite 301, San Francisco, California 94105. Upon information and belief, Defendant 7digital Limited currently has five officers who list correspondence address as 69 Wilson Street, London, EC2A 2BB.

88.      As of December 31, 2018, Defendants 7digital Group, Inc., 7digital, Inc. and 7digital Limited (collectively with 7digital Group PLC, "**7digital**") are wholly owned subsidiaries

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

of 7digital Group PLC, and each of them operate in concert with the others to such an extent as to be alter egos. Defendants 7digital Group, Inc., 7digital, Inc. and 7digital Limited are so interrelated as to be essentially the same company with 7digital Group PLC exercising near-complete control over Defendants 7digital Group, Inc., 7digital, Inc. and 7digital Limited. Defendants 7digital Group, Inc., 7digital, Inc. and 7digital Limited acts at the direction of and for the benefit of 7digital Group PLC to such an extent that they are substantially the same.

89.     7d operates an interactive cloud-based music and video streaming and download service under the federally registered trademark, "7DIGITAL".

90.     7d provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

91.     Upon information and belief, 7d has thousands of registered subscription-based users and free-based users in Connecticut.

92.     The musical works in PMR's Repertory have been streamed through 7d's service in Connecticut to end-user listeners in Connecticut.

93.     7d advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

94.     7d has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. 7d's conduct in this judicial district has caused substantial harm to PMR.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**M.**     **Deezer Defendants**

95.     Defendant Deezer S.A. is a French corporation with a place of business at 12 Rue d'Athenes, 75009 Paris, France.

96.     Defendant Deezer Inc. (together with Deezer S.A., "**Deezer**"), is a Delaware corporation with places of business in Denver, Colorado and Miami, Florida, and it is registered as a foreign business corporation operating in New York County with the New York State Department of State, and it may be served with process care of KVB Partners, 60 Broad St., Ste 3502, New York, NY 10004.

97.     Deezer operates a music and video streaming service.

98.     Deezer provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

99.     Upon information and belief, Deezer has thousands of registered subscription-based users and free-based users in Connecticut.

100.     The musical works in PMR's Repertory have been streamed through Deezer's service in Connecticut to end-user listeners in Connecticut.

101.     Deezer advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

102.     Deezer has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. Deezer's conduct in this judicial district has caused substantial harm to PMR.

    **N.**    **iHeartMedia, Inc.**

103.    Upon information and belief, Defendant iHeartMedia is a Delaware corporation, with its principal place of business in San Antonio, Texas, and maintaining corporate offices in New York, New York.  Also, iHeartMedia is registered as a foreign limited liability company operating in Connecticut.

104.    Operating under the name iHeartRadio, iHeartMedia offers internet radio services in the form of customizable music "stations" that stream music to users on the internet. iHeartMedia also owns hundreds of traditional ("terrestrial," or AM and FM) radio stations and streams their broadcasts online, including radio stations in Connecticut.

105.    iHeartMedia provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

106.    Upon information and belief, iHeartMedia has thousands of registered subscription-based users and free-based users in Connecticut.

107.    The musical works in PMR's Repertory have been streamed through iHeartMedia's service in Connecticut to end-user listeners in Connecticut and, upon information and belief, by Connecticut radio stations owned by iHeartMedia.

108.    iHeartMedia advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

109.    iHeartMedia has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in and from Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. iHeartMedia's conduct in this judicial district has caused substantial harm to PMR.

**O.    Connoisseur Media LLC**

110.    Defendant Connoisseur Media LLC ("**Connoisseur Media**") is a Delaware limited liability company with having its principal place of business in Westport, Connecticut.

111.    Connoisseur Media owns various radio stations in Connecticut.

112.    Connoisseur Media advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

113.    Connoisseur Media has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. From Connecticut, it has entered into an illegal agreement with other Defendants in and from Connecticut to boycott PMR all while, upon information and belief, publicly performing musical works in PMR's Repertory in Connecticut to end-user listeners in Connecticut. Connoisseur Media's conduct in this judicial district has caused substantial harm to PMR.

**P.    Pandora**

114.    Upon information and belief, Defendant Pandora Media LLC is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Oakland, California, and maintaining corporate offices in New York, New York. Also, Pandora is

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

registered as a foreign limited liability company operating in Connecticut, and it may be served with process care of Connecticut Corporation System, 67 Burnside Ave, East Hartford, CT 06108.

115.    Pandora is a music and video streaming service.

116.    Pandora provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

117.    Upon information and belief, Pandora has thousands of registered subscription-based users and free-based users in Connecticut.

118.    The musical works in PMR's Repertory have been streamed through Pandora's service in Connecticut to end-user listeners in Connecticut.

119.    Pandora advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

120.    Pandora has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in and from Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. Pandora's conduct in this judicial district has caused substantial harm to PMR.

**Q.    Rhapsody**

121.    Upon information and belief, Defendant Rhapsody is a Delaware corporation, with its principal place of business in Seattle, Washington.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

122.    Rhapsody is a music and video streaming service operated under the name, "Napster."

123.    Rhapsody provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

124.    Upon information and belief, Rhapsody has thousands of registered subscription-based users and free-based users in Connecticut.

125.    The musical works in PMR's Repertory have been streamed through Rhapsody's service in Connecticut to end-user listeners in Connecticut.

126.    Rhapsody advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

127.    Rhapsody has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. Rhapsody's conduct in this judicial district has caused substantial harm to PMR.

**R.    SoundCloud Defendants**

128.    Upon information and belief, Defendant SoundCloud Limited is a German limited company with a place of business at Rheinsberger Str. 76/77, 101115 Berlin, Germany.

129.    Defendant SoundCloud Inc. is a Delaware corporation having its principal place of business at 5th Floor, 71 West 5th Avenue, New York, New York, 10003. Upon information and

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT •06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

belief, SoundCloud Inc. provides SoundCloud Limited with research and development services and is the interface between SoundCloud Limited and its U.S. customers.

130.    SoundCloud Limited and SoundCloud Inc. (collectively, "**SoundCloud**") operate a music and video streaming service.

131.    SoundCloud provides its interactive streaming service and platform to individuals located in Connecticut and Connecticut residents, and it has targeted business efforts into this judicial district and has entered into multiple agreements for its interactive streaming services with residents and citizens of this judicial district.

132.    Upon information and belief, SoundCloud has thousands of registered subscription-based users and free-based users in Connecticut.

133.    The musical works in PMR's Repertory have been streamed through SoundCloud's service in Connecticut to end-user listeners in Connecticut.

134.    SoundCloud advertises, solicits customers, and conducts substantial amounts of business in the state of Connecticut and within this judicial district.

135.    SoundCloud has purchased licenses to publicly perform musical compositions from BMI and ASCAP and, upon information and belief, from SESAC and GMR. It has refused to purchase such licenses from PMR and entered into an illegal agreement with other Defendants, including in Connecticut, to boycott PMR all while publicly performing musical works in PMR's Repertory in Connecticut. SoundCloud's conduct in this judicial district has caused substantial harm to PMR.

**S.    Antitrust Co-Conspirators**

136.    The true names and capacities of Defendants' co-conspirators are unknown to PMR. It reserves its right to seek leave to amend this Complaint to identify additional defendants.

Such co-conspirators entered into the Defendants' illegal agreement, are members of the Cartel and are jointly and severally liable to the PMR.

**T.**     **Vicarious Conduct**

137.    Upon information and belief, at all times material hereto, each of the Defendants operated through the acts of its employees, agents, representatives, servants, and the like, acting within the course of their employment and scope of duties.

138.    Upon information and belief, at all times hereto, each of the Defendants acted on behalf of, for the benefit of and with the authorization of other Defendants.

139.    Each of the Defendants have been exerting , and continue to exert, pressure on their co-conspirators, including radio stations, televisions stations and music streaming services that are not yet joined in this action.

**U.**     **Groupings**

140.    Apple, Amazon, Google, YouTube, Spotify, 7digital, Deezer, iHeartMedia, Pandora, Rhapsody and SoundCloud may be referred to herein as the "**Streaming Defendants**".

141.    iHeartMedia and Connoisseur Media may be referred to herein as the "**Radio Defendants**".

142.    DiMA, RMLC, TVMLC, NRBMLC and Wine America may be referred to herein collectively as the "**Cartel Coordinators**".

**IV.    BACKGROUND FACTS**

**A.**     **What is a Monopsony?**

143.    A monopsony is a market structure dominated by collusive buyers (such as the Cartel and its respective members) having anticompetitive control over where a seller (such as PMR) may sell a product (such as a License) or the prices at which a seller can sell a product.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

144.    Generally, the goal of antitrust law is to enable optimal market output through competition. Anticompetitive conduct in a monopsony seems counterintuitive because the historical focus by litigants under the antitrust laws has been on anticompetitive conduct in a monopoly. Monopolies and monopsonies violate antitrust laws.

145.    A focus of a monopoly is on a high price set by a monopolist-seller (i.e., the supplier), and a focus of a monopsony is on low prices set by monopsonist-buyer (i.e., the buyer). Since a high price is an unlawful practice in a monopoly, it seems counterintuitive for low prices to be unlawful. but, low prices are, in fact, unlawful in monopsonies.

146.    An evil of monopsony is that the monopsonist underpays its sellers and then pockets the profits without doing anything productive or efficient with it. In other words, the buyer does not compete better because of low prices. Nor do lower prices create a more efficient market, make new products or add any value to competition with the added profits.

**B.      The Licensing of Copyrighted Music**

147.    Musical works are intellectual property, and like other forms of property, they belong to their creators—here, the songwriters, composers and publishers thereof.

148.    The right of public performance is one of the exclusive rights granted to copyright holders under the U.S. Copyright Act. *See* 17 U.S.C. § 106.

149.    The Copyright Act defines a public performance as one in "a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." 17 U.S.C. § 101. A public performance is also one that is transmitted or otherwise communicated to the public by means of a device or process, such as by radio or television broadcasts, music-on-hold, cable television, and over the internet.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

150.   No person can publicly perform copyrighted musical works with license. If no license is obtained, liability exists for copyright infringement and criminal prosecution under 17 U.S.C. § 506(a).

**C.    The Structure of the Performance Rights Market**

151.   Although copyright law allows copyright holders to license performance rights themselves, the Cartel believes it would be impossible for copyright holders to negotiate licenses with every radio station, television station, music streaming service, winery and so on.

152.   PROs aggregate the public performing rights of songwriters, composers and publishers, negotiate licenses with users publicly performing the musical works, and collect performance royalties for such public performances.

153.   PROs act as intermediaries between the copyright holders and the buyers of public performance rights licenses (*i.e.*, radio stations, music streaming services, television stations, bars, restaurants and others). Some of those buyers, including the Defendants, bestow authority on others, such as the Cartel Coordinators, to negotiate the terms and conditions for a License, including the price. Here, DiMA, RMLC, TVMLC, NRBMLC and Wine America, as Cartel Coordinators, have authority to negotiate such terms and conditions, communicate with the sellers of a License, such as PMR, resolve disputes therewith and, in certain circumstances, litigate in the rate court, in each instance for and on behalf of their constituents and co-conspirators. Conferring such authority to a Cartel Coordinator centralizes collusive negotiation activity, and in so doing, the horizontal competitors interact to such a degree they are no longer acting independently or in their individual economic interest. This collaboration also allows the Cartel to wield market power together.

154.    In coordinating competing licensing decisions, Cartel Coordinators necessarily restrict pricing competition for and on behalf of their constituent horizontal competitors, including the respective Defendants.

**D.      The Sell-Side of the Performance Rights Market**

**i.        BMI AND ASCAP**

155.    BMI and ASCAP are the largest sellers of performance rights Licenses. BMI, founded in 1939, licenses performance rights for more than 13,000,000 musical works of more than 1,000,000 songwriters, composers and publishers. ASCAP, founded in 1914, licenses performance rights for more than 11,500,000 musical works of more 740,000 songwriters, composers and publishers.

156.    BMI and ASCAP are subject to consent decrees arising from antitrust lawsuits brought by the United States alleging that each of them had unlawfully exercised market power acquired through the aggregation of public performance rights in violation federal antitrust laws.

157.    The consent decrees force a contrived and restrictive licensing system that produces below-market rates and imposes a court-administered rate-setting process in the rate court that is unresponsive to market forces and unable to consider all relevant data. The resulting terms and prices, both with and without the rate court, are not derived from arms-length transactions. They are not representative of a properly functioning market because, among other reasons, the information submitted to the rate court is sourced from the Defendants' rigged market. Also, the rate court is unauthorized to consider royalty rates being paid to record labels for the same performance rights when setting the rates for songwriters and music publishers. With this pervasively unfair pricing mechanism, not only are the PROs injured, but so too are the copyright holders.

158.     Prices for performance rights should be set by a free market. Unlike the compulsory licensing structure for a music publisher's mechanical rights under Section 115 of the Copyright Act, rates for performance licenses are not regulated by statute. The Cartel seeks to and does regulate every PRO, including PMR, through their anticompetitive agreement. That is wrong.

159.     The landscape of how music is consumed and distributed has significantly changed in recent history, particularly with the advent of digital music technology and streaming.  However, the Cartel conveniently ignores the reality that (i) the consent decrees are not aligned with technological advances and (ii) there are more than two PROs in the market.

160.     BMI and ASCAP commenced the creation of a joint comprehensive music database to assist in the payment of artists through licensing. Their initiative, to this day, does not include PMR.

### ii.    SESAC

161.     SESAC is an invitation-only PRO, licensing the performance rights for over 400,000 musical works. It is not subject to a consent decree, but, upon information and belief, it is subject to terms and conditions substantively similar to the consent decrees as a result of an antitrust lawsuit filed by RMLC, a Cartel member.

### iii.   GMR

162.     In or about 2014, GMR entered the market, as the then-fourth PRO, to compete with ASCAP, BMI and SESAC.

163.     Among the PROs, GMR holds the least number of musical works in its repertory, licensing performance rights for more than, upon information and belief, more than 25,000 musical works. GMR and the Defendants have said its repertory is a "must have."

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

164.    Upon information and belief, since its formation, GMR has been trying to sell Licenses for musical works of name-brand artists to Cartel Members.

165.    The Cartel should want Licenses to musical works of name-brand artists and popular musical works. But, true to form, upon information and belief, certain members of the Cartel, such as the RMLC and its radio stations, initially refused to deal with GMR. Then, just as it did with respect to SESAC, RMLC started an antitrust lawsuit against GMR and GMR separately filed an antitrust lawsuit against RMLC. In such lawsuits, and upon information and belief, RMLC and certain radio stations, on the one hand, and GMR, on the other hand, entered into an interim License. Those actions are set for trial in 2020.

### E.    The Buy-Side of the Performance Rights Market

#### i.    Streaming Defendants

166.    The Streaming Defendants own and operate music streaming services with users across the United States, including in Connecticut. They are horizontal competitors in the market, are the buyers of Licenses from PROs.

167.    The Streaming Defendants compete head-to-head for the business of listeners, customers and advertisers on their respective music streaming services.

168.    The Streaming Defendants compete for advertisers by demonstrating they have a significant number of listeners that meet the advertiser's target demographic.

169.    The Streaming Defendants compete for listeners by providing content to those listeners. Frequently, that content is copyrighted music which must be licensed from the various PROs, including PMR.

ii.     **iHeartMedia and Connoisseur Media**

170.    iHeartMedia and Connoisseur Media own and operate terrestrial radio stations in the United States, including in Connecticut.

171.    iHeartMedia owns and operates various terrestrial radio stations in Connecticut, including, WHCN 105.9, WKSS 95.7, WPOP 1410, WUCS 97.9, WWYX 92.5, WAVZ 1300, WELI 960, WKCI-FM 101.3 and WKCI-FM HD2 100.9, each of which is physically located in Connecticut.

172.    Connoisseur Media owns and operates various terrestrial radio stations in Connecticut, including, WICC 600, WEBE 107.9, WYBC 94.3, WFOX 95.9, WPLR-FM 99.1, WEZN-FM 99, each of which is physically located in Connecticut.

173.    The Radio Defendants compete head-to-head for the business of listeners, customers and advertisers on their respective music streaming services.

174.    The Radio Defendants compete for advertisers by demonstrating they have a significant number of listeners that meet the advertiser's target demographic.

175.    The Radio Defendants compete for listeners by providing content to those listeners. Frequently, that content is copyrighted music which must be licensed from the various PROs, including PMR.

176.    Radio Defendants are direct horizontal competitors in the market and are buyers of Licenses from PROs.

iii.    **RMLC**

177.    A purpose of RMLC is to identify the PROs with which it will negotiate Licenses to publicly perform musical works for the benefit of its members and the commercial radio

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

industry, some 10,000 radio stations. Each of those radio stations are direct horizontal competitors in the market and are the ultimate buyers of Licenses from PROs.

178.    RMLC has refused to identify PMR as a PRO with whom to negotiate a License due to the Cartel's anticompetitive agreement.

179.    The RMLC's member stations compete head-to-head for the business of local and national companies that seek to advertise on broadcast radio.

180.    The RMLC's member stations compete for advertisers by demonstrating they have a significant number of listeners that meet the advertiser's target demographic.

181.    The RMLC's member stations compete for listeners by providing content to those listeners. Frequently, that content is copyrighted music which must be licensed from the various PROs.

182.    The RMLC has been negotiating Licenses for fees and terms on behalf of those radio stations with GMR, SESAC, ASCAP and BMI to secure license fees for the public performance of copyrighted musical works.

183.    Those radio stations agreed to be bound by the terms of licenses negotiated by the RMLC by signing authorization agreements, such as the following:



**AUTHORIZATION**

On behalf of the stations(s) named below ("stations"), I hereby authorize the Radio Music License Committee (RMLC) to negotiate with the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music Inc. (BMI) for licenses for performance rights necessary and/or appropriate for the stations' conduct of their businesses; to institute or defend in the name of all authorizing stations proceedings to establish reasonable fees and terms for such licenses; and to do all things reasonable and convenient in connection with such negotiations and proceedings.  I understand that, by giving this authorization, I agree to be bound by the outcome of any licensing negotiation or proceedings commenced on behalf of authorizing radio stations by the RMLC.  I further understand that, in the event of a change of station ownership in the future, the new owner shall be entitled to assume the benefits and obligations of this authorization.

184.    Those radio stations bestowed negotiating power upon RMLC in order "to keep license fees for the commercial radio industry as low as [it] can possibly keep them," which makes them active co-conspirators of the Cartel. They are aware of, and in fact count on, RMLC's influence over the PROs and centralized negotiating power to destroy competition among the radio stations and other members of the Cartel to purchase Licenses.

185.    Each of those radio stations would not have agreed to authorize RMLC to negotiate binding terms and conditions for Licenses on its behalf without the same concomitant agreement from the other radio stations. Otherwise, the radio stations that did not confer such authority to RMLC would band together to negotiate better terms and conditions than those that had. By colluding with and through RMLC, those radio stations believe they are shielded from liability for their anticompetitive agreement. By RMLC's acting as their common voice, those radio stations are refusing to deal with PMR, acting against their self-interest, eliminating any competition amongst themselves, setting below-market rates and giving themselves significant market power to purchase Licenses .

186.    In other words, the aggregation of the radio stations' buying power in and to RMLC, both RMLC and those radio stations wield significant market power. The very *raison d'etre* of RMLC is to exert such undoubted market power in order to centralize command of the radio stations' participation in the Cartel. That is why RMLC and the radio stations have refused to deal with PMR, and that is why there is a complete absence of price competition between and among the television stations when RMLC negotiates for and on their behalf.

187.    RMLC regularly provides its radio stations with information concerning its negotiations at various industry conferences, venues and association events, such as the MFM/BCAA.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

188.   RMLC's Board of Directors has approximately 25 members, who are all employees of companies whose business consists, at least in part, of commercial radio broadcasting.

189.   RMLC's Board's executive committee presently consists of eight representatives from its Board, presently containing representative and executives from Cox Media, Midwest Communications Inc., iHeartMedia Inc., Saga Communications Inc., Cumulus Media Inc., Entercom Communications Corp. and Hubbard Radio, each of which own radio stations across the United States Market. RMLC's executive committee has the primary responsibility for engaging with William Velez, its Executive Director, and RMLC's attorneys on the ordinary business of RMLC and its major licensing initiatives and related litigations and arbitrations with other PROs. RMLC's executive committee meets, typically by conference call, multiple times throughout the year. RMLC distributes packets of information to RMLC's board containing various financial reports.

190.   The plan of those radio stations and RMLC has worked. RMLC has touted, "the RMLC has **always** been able to come to agreement with both ASCAP and BMI over fees and terms for the right to publicly perform the musical works in those performing rights organizations' ('PROs') repertoires prior to the invocation of the supervising courts' authority to determine final license fees."

191.   RMLC has also said, "radio stations operating pursuant to the most recently negotiated RMLC agreements with ASCAP and BMI pay license fees to each of those PROs in the approximate aggregate amount of $150 million annually [and] [t]hese license fees represent a significant portion of the total royalties collected annually by those PROs."

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

192.     RMLC also has said in 2014: "In stark contrast to its experience with ASCAP and BMI, the RMLC has never had any success in negotiating with SESAC, LLC ("SESAC")-a third U.S. PRO that, unlike ASCAP and BMI, is not subject to an antitrust consent decree."

193.     Additionally, RMLC has admitted it "has coordinated and funded 'rate court' litigation" for and on behalf of its radio stations.

194.     The RMLC's staff consists of William Velez, its Executive Director, and the former Chief Executive Officer of SESAC, and one staff accountant/data manager.

195.     Mr. Velez testified under oath that RMLC corresponds *daily* with the employees and executives of its radio stations and other Cartel members regarding issues associated with performance rights licensing.

### iv.    TVMLC

196.     TVMLC, an organization funded by voluntary contributions from the television broadcasting industry, represents the collective interests of some 1,200 local commercial television stations in the United States in connection with certain music performance rights licensing matters, including public performance rights. Each of those television stations are direct horizontal competitors in the market and are the ultimate buyers of Licenses from PROs.

197.     A purpose of TVMLC is to identify the PROs with which it will negotiate Licenses to publicly perform musical works for the benefit of its and the commercial television industry. Each of those television stations are direct horizontal competitors in the market and are the ultimate buyers of Licenses from PROs.

198.     TVMLC has refused to identify PMR as a PRO with whom to negotiate a License due to the Cartel's anticompetitive agreement.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

199.     The TVMLC's member stations compete head-to-head for the business of local and national companies that seek to advertise on commercial television.

200.     The TVMLC's member stations compete for advertisers by demonstrating they have a significant number of viewers that meet the advertiser's target demographic.

201.     The TVMLC's member stations compete for viewers by providing content to them. Frequently, that content contains copyrighted music which must be licensed from the various PROs.

202.     The TVMLC has been negotiating Licenses for fees and terms on behalf of those television stations with GMR, SESAC, ASCAP and BMI to secure license fees for the public performance of copyrighted musical works in their content.

203.     Upon information and belief, those television stations agreed to be bound by the terms of licenses negotiated by the TVMLC by signing authorization agreements similar to the following:



TELEVISION MUSIC LICENSE COMMITTEE, LLC

**ASCAP, BMI and SESAC Authorization**

On behalf of Television Station (insert call letters) _____, the Licensee named below authorizes the Television Music License Committee, LLC to represent it in connection with the local television industry's negotiations, any future rate court litigation and/or rate-setting arbitration, and implementation of interim and final agreements with ASCAP, BMI and SESAC regarding public performance license fees and terms.

204.     Each of those televisions stations would not have agreed to authorize TVMLC to negotiate binding terms and conditions for Licenses on its behalf without the same concomitant agreement from the other television stations. Otherwise, the television stations that did not confer

such authority to TVMLC would band together to negotiate better terms and conditions than those that had. By colluding with and through TVMLC, those television stations believe they are shielded from liability for their anticompetitive agreement. By TVMLC's acting as their common voice, those television stations are refusing to deal with PMR, acting against their self-interest, eliminating any competition amongst themselves, setting below-market rates and giving themselves significant market power to purchase Licenses .

205.    In other words, the aggregation of the television stations' buying power in and to TVMLC, both TVMLC and those television stations wield significant market power. The very *raison d'etre* of TVMLC is to exert such undoubted market power in order to centralize command of the television stations' participation in the Cartel. That is why TVMLC and the television stations have refused to deal with PMR, and that is why there is a complete absence of price competition between and among the television stations when TVMLC negotiates for and on their behalf.

206.    Those television stations bestowed negotiating power upon TVMLC in order to keep license fees for local commercial television stations industry as low as it can keep them. Those television stations are active co-conspirators of the Cartel. They are aware of, and count on, TVMLC's influence over the PROs and centralized negotiating power to destroy competition among the television stations and other members of the Cartel to purchase Licenses.

207.    Unlike with PMR, TVMLC has negotiated extensively, over decades, with the two larger PROs–ASCAP and BMI–for and on behalf of its television stations for Licenses to publicly perform musical works.

208.    For example, in or about 2016, TVMLC applied for a License from ASCAP on behalf of its television stations. After having negotiated and reached a confidential agreement with

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

ASCAP for and on behalf of its television stations, it was TVMLC who distributed such agreements to its television stations, such that, upon information and belief, not one television station that is a member of TVMLC separately negotiated and reached a separate agreement with ASCAP.

209.    Further, it has funded and managed antitrust and federal "rate court" litigation for and on behalf of its television stations to minimize the market power enjoyed by PROs.

210.    Additionally, TVMLC is responsible for allocating the industry-wide ASCAP, BMI and SESAC blanket license fees negotiated by TVMLC to its television stations.

211.    Collectively, local commercial television stations represented by TVMLC pay some $140 million annually in musical works public performance license fees to ASCAP, BMI, and SESAC combined-a significant portion of the total royalties collected annually by those PROs.

### v.    NRBMLC

212.    A purpose of NRBMLC is to identify the PROs with which it will negotiate Licenses to publicly perform musical works for the benefit of its members. Each of those radio stations are direct horizontal competitors in the market and are the ultimate buyers of Licenses from PROs.

213.    NRBMLC has refused to identify PMR as a PRO with whom to negotiate a License due to the Cartel's anticompetitive agreement.

214.    The NRBMLC's member stations compete head-to-head for the business of local and national companies that seek to advertise on broadcast radio.

215.    The NRBMLC's member stations compete for advertisers by demonstrating they have a significant number of listeners that meet the advertiser's target demographic.

216. The NRBMLC's member stations compete for listeners by providing content to those listeners. Frequently, that content is copyrighted music which must be licensed from the various PROs.

217. The NRBMLC has been negotiating Licenses for fees and terms on behalf of those radio stations with GMR, SESAC, ASCAP and BMI to secure license fees for the public performance of copyrighted musical works.

218. Those radio stations agreed to be bound by the terms of licenses negotiated by the RMLC by signing authorization agreements, such as the following:

219. NRBMLC serves its authorized stations in negotiating public performance licenses with PROs, including BMI, ASCAP, SESAC and GMR.

220. NBRMLC seeks authorizations from its members in writing:



**AUTHORIZATION FOR**
**Broadcast/Internet Music License Proceedings**
(If you operate more than one station, complete one Authorization for each station)

I hereby authorize the NRB Music License Committee to represent my station in negotiations and/or proceedings with the music performance rights organizations (PROs), as indicated below. The Committee is also authorized to institute on behalf of such station licensing fee proceedings should they be necessary, and to negotiate settlements deemed by the Committee to be in the best interests of the stations represented taken, as a whole, in light of available resources.



**AUTHORIZATION FOR**
Broadcast/Internet Music License Proceedings with
**GLOBAL MUSIC RIGHTS**
(If you operate more than one station, complete one Authorization for each station)

I hereby authorize the NRB Music License Committee to represent my station in negotiations and/or proceedings with the music performance rights organization **Global Music Rights (GMR)** as indicated below. The Committee is also authorized to institute on behalf of such station licensing fee proceedings should they be necessary, and to negotiate settlements deemed by the Committee to be in the best interests of the stations represented.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM



**NONCOMMERCIAL RADIO STATION**

Authorization for Music License Negotiations/Proceedings

I hereby authorize the NRB **Noncommercial** Music License Committee to represent my station in negotiations and/or proceedings with the music performance rights organizations (PROs) and with the appropriate recording industry representatives as indicated below. The Committee is also authorized to institute on behalf of such station licensing fee proceedings should they be necessary, and to negotiate settlements deemed by the Committee to be in the best interests of the stations represented taken, as a whole, in light of available resources.

221.    It is presently negotiating licenses on behalf of their members to publicly perform musical works with BMI, ASCAP and GMR.

222.    Those radio stations bestowed negotiating power upon NBRMLC are active co-conspirators of the Cartel. They are aware of, and in fact count on, NBRMLC's influence over the PROs and centralized negotiating power to destroy competition among the radio stations and other members of the Cartel to purchase Licenses.

223.    Each of those radio stations would not have agreed to authorize NBRMLC to negotiate binding terms and conditions for Licenses on its behalf without the same concomitant agreement from the other radio stations. Otherwise, the radio stations that did not confer such authority to NBRMLC would band together to negotiate better terms and conditions than those that had. By colluding with and through NBRMLC, those radio stations believe they are shielded from liability for their anticompetitive agreement. By NBRMLC's acting as their common voice, those radio stations are refusing to deal with PMR, acting against their self-interest, eliminating any competition amongst themselves, setting below-market rates and giving themselves significant market power to purchase Licenses .

224.    In other words, the aggregation of the radio stations' buying power in and to NBRMLC, both NBRMLC and those radio stations wield significant market power. The very *raison d'etre* of NBRMLC is to exert such undoubted market power in order to centralize command of the radio stations' participation in the Cartel. That is why NBRMLC and the radio

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

stations have refused to deal with PMR, and that is why there is a complete absence of price competition between and among the radio stations when NBRMLC negotiates for and on their behalf.

225.    NBRMLC regularly provides its radio stations with information concerning its negotiations at various industry conferences, venues and association events.

### F.    The Cartel Refuses to Deal with PMR

226.    In the summer of 2018, PMR identified the Streaming Defendants using musical works in PMR's Repertory without License. PMR then sought to negotiate a License with each of them. PMR sent a written offer, along with a form License agreement, to them and various other co-conspirators asking to negotiate a License on fair, reasonable and competitive terms. PMR also communicated to certain Streaming Defendants that it would adopt their respective license agreement in order to streamline negotiations.

227.    After Streaming Defendants failed to engage in any substantive negotiations for a License, PMR sent another round of communications to them and various other co-conspirators. Again, they refused to engage in any substantive negotiations. Of those Streaming Defendants who responded to PMR, they offered a choreographed response: negotiating a license with PMR will cost too much in lawyer fees, the Licensee fee was not aligned with the rate court decisions, and the royalty rate was higher than what BMI and ASCAP charge.

228.    When the Streaming Defendants finally made clear they would not deal with PMR, PMR demanded each Streaming Defendant cease and desist from infringing musical works in PMR's Repertory. Of those Streaming Defendants who responded to PMR, they offered another choreographed response: we'll take down the musical works. Voluntarily taking down musical works does not cure copyright infringement.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

229.    In 2018 and 2019, PMR again sought to negotiate with the Streaming Defendants, and also invited the Cartel Coordinators to negotiate on behalf of their members, as the Cartel Coordinators say they had done with BMI and ASCAP. They refused, again, to deal with PMR.

230.    On November 13, 2019, PMR issued a press release announcing the first-ever standardized performance rights License under which, among other things, the royalty would be paid directly to the copyright holder of the musical work without PMR's deducting any administrative percentage or otherwise utilizing a royalty pool model (a structure used by BMI and ASCAP).

231.    With such standardized Licenses, PMR sought to shift all compensation to the copyright holders, which is not the payment structure of the other PROs. When PMR tried, again, to negotiate Licenses with such standardized Licenses, the Cartel refused to deal with PMR.

232.    The Defendants are against the payment of fair compensation to songwriters, composers and publishers. That is evidenced by the recent appeal by Spotify, Amazon, Google and Pandora of a decision by the United States Copyright Royalty Board ("**CRB**") increasing the revenue share owed to songwriters and publishers by approximately 44% for mechanical licenses. The CRB's decision increasing the total amount paid by Streaming Defendants for mechanical licenses increased from 10.5% to 15.1%, which is substantially in-line with rates outside the United States.

233.    In or about November 2019, Defendant WineAmerica refused to even consider PMR's offer to negotiate. WineAmerica went so far as to refuse mail service of PMR's November 11th offer—a flat out refusal to engage in any discussion with PMR.  Without even opening the envelope, WineAmerica was aware of its contents from the coordinated communication the Cartel.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

234.    In or about November 2019, TVMLC likewise refused to negotiate with PMR, offering another choreographed response that TVMLC could not identify PMR's Repertory. That is a bad excuse, PMR's Repertory is available for download. TVMLC had no intention of negotiating a License with PMR.  Its response was a smoke screen for its real agenda: to keep PMR out of the market.

235.    In or about November 2019, RMLC falsely stated to PMR that RMLC lacks the authority to negotiate on behalf of its radio stations. RMLC further stated that RMLC has not sought or received any authorization from its radio stations to negotiate with PMR. That is due to the anticompetitive agreement to boycott PMR and not due to any legitimate business reason. Indeed, RMLC responded with an implicit threat of a lawsuit against PMR.

236.    Additionally, RMLC conditioned any further discussion with PMR, on the one hand, and RMLC and its radio stations, on the other hand, on the execution of an agreement and acknowledgment that RMLC is not in any way preventing PMR from dealing with individual radio stations. Such an express condition is an acknowledgment of the anticompetitive agreement between and among the Defendants, RMLC and its radio stations. RMLC's refusal to deal with PMR has been continually motivated by the Cartel's anticompetitive purpose and objective to rig the market  and prevent PMR from competing with the other PROs.

## V.      THE CARTEL'S UNLAWFUL AND ANTICOMPETITIVE ACTIVITIES

237.    The Cartel has engaged in a continuing conspiracy to restrain trade in the performance rights market by refusing to deal with PMR and, by extension, blocking consumer access to the PMR Repertory.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**A.**     <u>The Cartel's Purpose and Motivation of the Anticompetitive Agreement</u>

238.    The Cartel's boycott of PMR and its infracompetitive prices (i) cause damages and loss to PMR; (ii) suppress competition between and among the members of the Cartel; (iii) the reduction of upstream and downstream output (*e.g.*, none of the musical works in PMR's Repertory are being licensed); and (iv) the distortion of prices.

239.    Given this framework, it is easy to see why the Cartel has a motive to enter into its conspiracy. As here, each colluding radio station (*i.e.*, RMLC's members, iHeartMedia or Connoisseur Media), television station (*i.e.*, TVMLC's members), music streaming service (*i.e.*, DiMA and the Streaming Defendants) and other venues or users that publicly performs copyrighted works, is better off, at least in the short term, to enter into and perform the anticompetitive agreement.

240.    Each Cartel member refuses to deal with new PROs and can continue to purchase licenses at infracompetitive levels only if the other Cartel members do not cheat on the agreement by engaging in licensing deals with PMR, which would result in driving up the licensing rate, creating a new licensing costs, and disbanding the conspiracy.

241.    Each Cartel member has an incentive to further its own economic interest. None have done so with PMR, however, because each Cartel member is holding out for the long-term benefit of the conspiracy: stifling competition to avoid PMR (or any other PRO) from accumulating fractional rights to musical works.

242.    For example, if a Cartel member purchases a license to publicly perform musical works available *only* to it as a result of a license from PMR, that Cartel member could provide higher quality, better or diverse music to its listeners—to the exclusion of every other Cartel member. Becoming that Cartel traitor would drive up the ratings which, in turn, would increase

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

revenue. Better yet, if PMR controls all performance rights for a new chart-topping song, the Cartel traitor will, in effect, have a superior competitive advantage over the Cartel members without a License. Even better, if the works in PMR's Repertory contain multiple hit songs, then the Cartel traitor would be the *only* buyer lawfully able to play such work.

243.    Even better than that, the Cartel traitor would have the first opportunity to negotiate an exclusive arrangement for the public performance of musical works from a PMR artist. For example, the Cartel traitor would have another chance at another superior competitive advantage over the Cartel members if it secures for itself the exclusive right to publicly perform such musical works. It makes no sense to give up such opportunity to find new musical works in non-traditional manners. Justin Bieber was sourced from YouTube. Post Malone was sourced from SoundCloud. Yet, each of these Defendants, and the remainder of the Cartel members, are sacrificing individualistic value through blind adherence to the Cartel's anticompetitive agreement.

244.    Absent the Cartel's conspiracy, it makes no sense for the thousands of radio stations represented by the RMLC and NRBMLC, the thousands of television stations represented by the TVMLC, the thousands of wineries represented by Wine America, the Streaming Defendants and the music streaming services represented by DiMA to not even explore the musical works in the PMR Repertory. None of them have done so.

245.    The Cartel stands guard over its anticompetitive agreement because the potential cost of dealing with PMR outweighs the potential benefits. When a Cartel traitor secures a license from PMR resulting in a hit song, the other Cartel members are forced to secure a License from PMR in order to remain competitive with the Cartel traitor. That License is the incremental cost the Cartel so desperately tries to avoid. Because, at the end of the day, the Cartel does not want a crowded PRO market.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

246.     With numerous competitors in the sell-side of the market, the Cartel's version of Armageddon is created: hundreds of PROs not subject to consent decrees are in the market, copyright holders leave BMI and ASCAP in droves for those other PROs, and the Cartel must secure Licenses from those hundreds of PROs to publicly perform musical works. TVMLC publicly acknowledges that the "music licensing marketplace is unquestionably harmed by the fact that there are PROs that are not subject to Consent Decrees."  RMLC agrees with TVMLC's statement because, when GMR entered the marketplace, RMLC said, "the music licensing landscape is being *complicated* by the entry of . . . [GMR]."

247.     Because PMR is not subject to the consent decrees, the Cartel and TVMLC harbor the false belief that PMR's competition in the market is harming the music licensing marketplace. For starters, new competitors increase competition and value for a number of reasons, one of which is in offering lower prices.

248.     So, just as the Cartel did with SESAC, the Cartel first refused initially to deal with GMR and, when that did not work because GMR had, in TVMLC's words, a "must have" repertory, the Cartel brought an antitrust lawsuit against GMR.

249.     RMLC offers corroboration in an industry-wide email to its radio stations: "As was the case with SESAC prior to the RMLC achieving a legal settlement that resulted in SESAC's license fees being subjected to rate arbitration for the first-time with the radio industry, GMR is also a non-regulated, for-profit entity that is attempting to impose supra-competitive license fees upon the radio industry." It further identifies the Cartel's primary goal of refusing to deal with any new PRO in the hope of driving that PRO out of business:

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

*Seek to avoid playing GMR compositions.*

The RMLC has negotiated its members' ability to use the aforementioned GMR repertory information to attempt to avoid playing GMR compositions that are not otherwise licensed. We note, however, that the GMR catalog is ever-changing and that it will be impossible, as a practical matter, to avoid with certainty playing GMR compositions, particularly given (i) how long it can take to determine publishing ownership and splits for newly-released recordings, and (ii) that advertising and certain other programming is often supplied by third parties over whom your stations do not exercise control.

250.     If the Cartel is unsuccessful in driving the PRO out of business, then it is because such PRO has, according to the Cartel's propaganda, a "must have" repertory. In that scenario, the Cartel's back-up plan is to bring an antitrust lawsuit, RMLC's words:

*Bring an antitrust lawsuit against GMR.*

We believe that GMR presents many of the same antitrust concerns that led to the RMLC's complaint against SESAC; and that it wields a more meaningful catalog for radio . . .  We are seeking to require GMR to offer a reasonable license to the industry on an interim basis pending the determination of the merits of the antitrust lawsuit and, ultimately, to subject GMR to the same sorts of restrictions placed on ASCAP, BMI, and SESAC through the ASCAP and BMI consent decrees and industrywide antitrust settlement with SESAC.  We determined that it was necessary to file now in order to seek injunctive relief before the end of this year that would protect our members from infringement claims. There is no guarantee that such relief will be granted, in which case stations may decide they also need to pursue one of the options above.  We also want to stress that we remain open to, and hope to pursue, continued negotiations with GMR while the antitrust case is pending.

251.     All of this—the Cartel's lawsuit against SESAC, the Cartel's lawsuit against GMR, and the Cartel's treatment of PMR—illustrate the Cartel's playbook of how to deal with a situation, as RMLC puts it, "in the face of proliferating music licensing agencies" that are not BMI and ASCAP:

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GMR, a public-performance-right licensing agency, is distinguished from ASCAP and BMI, in particular, in that it is a privately-held, for-profit firm that has created a bottleneck to, and artificial monopoly over, the works in its repertory.  Unlike SESAC, ASCAP and BMI, which are all now subject to some form of rate regulation that acts to prevent monopoly pricing, GMR has thus far managed to avoid similar limits on its monopoly pricing.

252.    Since both SESAC and GMR are not subject to consent decrees, the Cartel deployed their anticompetitive playbook against them. That is precisely what the Cartel is now doing to PMR. TVMLC publicly outlines the Cartel's "Two Step" playbook on how to deal with a new PRO, such as PMR.

a.    Step One: the Cartel refuses to deal with PMR.

b.    Step Two: if the Cartel cannot do that with PMR because the PMR Repertory becomes sufficiently popular (in TVMLC's words a "PRO that secures a repertory that is sufficient large such that a license from it becomes 'must have'"), then the Cartel will force PMR to become subject to terms and conditions substantively similar to the consent decrees or face an antitrust lawsuit.

253.    The Cartel deployed Step One on SESAC, GMR and, now, PMR. It deployed Step Two on SESAC and GMR because the Cartel admits that SESAC's and GMR's repertory contains "must have" musical works. But, here, the Cartel has not yet said the musical works in the PMR Repertory are "must have," so the Cartel has not yet moved to Step Two with PMR.

254.    The Cartel avoids such a cataclysmic financial disaster by blind adherence to its anticompetitive agreement and implicit trust between and among horizontal competitors. Each Cartel member should want to find that next hit song for its end-user listeners. Instead of acting selfishly, however, each Cartel member is acting to protect the collective interest of the Cartel. In refusing to deal with PMR, or any other PRO for that matter, the quality of the works in PMR's

Repertory or the transactional cost, as they falsely say it does, actually has nothing whatsoever to do with refusing to deal with PMR. Their liability arising from willful copyright infringement carries more economic and reputational risk. Not one member of the Cartel has listened to each song in PMR's Repertory.

255.    With respect thereto, fractionalized rights of copyright holders and, by extension, the PROs, are of great concern to the Cartel due to the increased costs. For instance, TVMLC admits its staunch opposition to any new PRO, saying specifically that any new PRO coming into the market "with partial ownership interests" will exploit "hold-up power" by engaging in "gun-to-the-head licensing tactics":

> Fractional licensing undermines the efficiencies created through collective licensing by requiring music users to secure, before the time of performance, all of the fractional interests to works in the ASCAP and BMI repertories, including those that can be licensed through ASCAP and BMI and those that cannot. Under a fractional rights licensing regime, ASCAP and BMI would no longer provide music users with the full set of rights necessary to actually perform all of the works in their respective repertories and no longer provide indemnification from copyright infringement lawsuits for all of those works. Instead, those PROs would only provide a subset of the what is needed to actually perform works and indemnification only as to those fractional shares, leaving it to the music user to ensure that it has secured whatever remaining rights are no longer available from ASCAP and BMI before any "split works" can actually be performed – a near impossible task given the transparency issues endemic to the music industry. As a result, ASCAP and BMI licenses, as they relate to these split works, would provide the music user with precisely no value until such a time as the music user is able to identify and negotiate with each and every non-ASCAP and BMI affiliated co-owner of these split works (or their unregulated PRO). Until this happens, these works, that are in the ASCAP and BMI repertories, cannot be performed. As the above makes plain, a fractional licensing regime increases transactions costs faced by licensees. And, this increase in transaction costs is not trivial – the number of co-written works and the numbers of writers and publishers for each such work has increased significantly over

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

256.     TVMLC likewise shares its staunch opposition to the creation or maintenance of any new competition with the entry of a PRO, such as PMR. In essence, TVMLC says, on the one hand, BMI and ASCAP wield too much market power but, on the other hand, the introduction of new PROs into the "music licensing landscape" will result in a "more fractionalized and anticompetitive" market. PMR's competition is a benefit to the market.

257.     Music Choice, a co-conspirator of Defendants, corroborates the purpose of the Cartel's anticompetitive agreement to prevent new sell-side competition:

> such licenses will allow those PROs, which each represent approximately 45% of the market based upon the shares of songs they own, to wield even higher effective market share because it would allow the PROs to threaten litigation over 100% of each song, even where they only represent 1% of that song.

258.     TVMLC has publicized the unlawful purpose of the Cartel's competitive agreement: "Rather than having to secure licenses from two monopolists regulated by Consent Decrees [*e.g.*, BMI and ASCAP] and one monopolist regulated pursuant to a private antitrust settlement [*e.g.*, SESAC], local stations will have to negotiate with these same entities and will be forced to secure a license from one or two additional wholly unregulated monopolists." Such statement evidences the Cartel's intent to prevent or stifle the entry of PMR and any new PROs into the market.

259.     DiMA and RMLC have similarly communicated their disdain for new PROs and PMR. In a joint statement, they say the Cartel seeks to bar new sell-side competition by PROs because any new competitor gaining any market power results in "the growth in split works (where one work is owned fractionally by different rights owners) and the practice of fractional licensing (where to use a work you need to obtain a license from all co-owners separately)."

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

260.     DiMA and RMLC refuse to deal with any new PRO, such as PMR, "because of the exponential growth in the number of co-writers of popular songs, as well as rights owners' recent insistence that public performance rights in each co-writer's share be separately licensed."

261.     As pure evidence of the Cartel's choreographed propaganda and alignment to the anticompetitive agreement, DiMA and RMLC say:

> in a world of fractional licensing, each [competitor] would wield a complete hold-up right, as anyone wishing to use any song would need a license from each [copyright holder]. And their interests would be entirely complementary, rather than competitive with each other. After all, nothing any of them could license, on their own, would actually yield legal permission to play anything; a license from each of them would be required in order for any of the licenses to be at all useful.

262.     DiMA further explains its reason for refusing to deal with new PROs, such as PMR, and entering into the Cartel's anticompetitive agreement by way of an example of the hit song "Old Town Road" by Lil Nas X:

> That song, according to separate searches of ASCAP and BMI's respective repertory databases, is controlled by three separate publishers: Universal Music Publishing Group, Downtown Music Publishing, and Kobalt Songs Music Publishing. ASCAP and BMI claim to offer only a "fractional license" for the shares represented by their respective members: BMI claims to offer a license only to Universal's and Downtown's shares, and ASCAP to Kobalt's share. So, as the PROs see it, a digital service that wants to stream "Old Town Road" today needs a license from both ASCAP and BMI. This is bad enough. But things would get *worse* if Universal were to "partially withdraw" its share from BMI. A digital music service would then need to clear rights from *three* entities to play that same song: ASCAP, BMI, and Universal. This result, of course, does nothing for competition or consumer welfare; it simply allows publishers to impose an added tax on the digital economy—with all of the predictable, concomitant output reductions that such incremental hold-ups invariably entail.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

263.     Keeping to the party line, NRBMLC echoes RMLC's, TVMLC's and DiMA's public statements seeking to bar new PROs from creating a competitive landscape due to such a new PRO gaining a "single right to exploit a single work [which] may require multiple licenses if the work was authored by more than one person":

> This allows the last PRO or copyright owner holding an interest in the work to exercise enormous "hold up" power by threatening to decline consent to perform the work, which enables that holdout to demand license fees that are far higher than the value of the fractional right granted – a practice that further harms competition in the music licensing market.

264.     Next, iHeartMedia, NRBMLC, Pandora, RMLC, Rhapsody and TVMLC, together with various co-conspirators, jointly submitted a statement aligning with the statements from the Cartel voicing a more dire result from the creating of, as they put it, "unregulated PROs, such as Global Music Rights":

> Users would face a Hobson's choice: either shoulder the commercially infeasible administrative burden of seeking to avoid performances of all the works in which such unregulated licensing entities hold merely a fractional interest, or accede to said entities' license fee demands.

265.     Music Works likewise uses the same terminology as iHeartMedia, NRBMLC, Pandora, RMLC, Rhapsody and TVMLC: "Music Choice faces a Hobson's choice in its negotiations to license 'must have' music from the PROs that are not subject to Consent Decrees."

266.     Wine America and other co-conspirators of the Cartel, such as Music Choice, MIC, The National Association of Theatre Owners, have also used the "take it or leave it" motto in describing so-called anticompetitive business practices PROs not named BMI or ASCAP.

267.     Plainly, iHeartMedia, NRBML, Pandora, RMLC, Rhapsody and TVMLC, together with various co-conspirators, complain about the supposed hardship they would have to endure in

a "regime requiring the tracking down and securing of a license from every owner of a joint work" from "the PROs with which those composers and publishers are affiliated".

268.    iHeartMedia, NRBML, Pandora, RMLC, Rhapsody and TVMLC, together with various co-conspirators, feign concern about how new PROs "increase[] both the transaction costs incurred and the risk of copyright infringement assumed by users in securing music performance licenses." Indeed, they absurdly suggest a License is not required to publicly perform musical works: "if a user was required to hold licenses from every copyright claimant to a given work or its PRO in order to avert copyright infringement exposure," the new PROs and the fractional owners would likewise be monopolists.    They continue with a laundry list of negative consequences arising from the creation of PROs: any PRO holding a fractional interest "would likely still enjoy substantial market power due to the partial interests they would retain."

269.    A MIC member, who is a co-conspirator of the Cartel, publicly states a substantively identical message:

> "Fractional licensing" is harmful to competition for several reasons. First, it not only would institutionalize the high transaction-cost environment that presently exists, but also would risk exacerbating the problem by incentivizing rightsholders to create more and more individually-licensable fractions. These ever-increasing transaction costs would further discourage entry, expansion, and innovation in music distribution platforms, to the detriment of competition, consumers, and artists.

270.    iHeartMedia has acknowledged the success of the Cartel's anticompetitive agreement: "from the perspective of licensees today, there is little if any competition between the PROs."

271.    The Cartel's public statements, using similar and identical language confirms the existence of the concerted effort to restrain trade and refuse to deal with PMR.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

272.    In sum, no one in the Cartel can cheat for long on the Cartel's other members by offering a higher price for a License. Such behavior would be detected immediately and would cause the cartel to collapse.

**B.      The MIC Coalition**

273.    The Cartel is engaging in a sustained, anticompetitive campaign to create insurmountable barriers for PMR into the market. This includes widespread commentary about the purported evils of unregulated PROs and alternate licensing models, including lengthy and numerous pro-consent decree submissions to the Department of Justice (the "DOJ").

274.    Defendants only support ASCAP and BMI because of the incredible bargain they get under the consent decrees: "The most critical step to do that is preservation of the protections of the consent decrees that govern the American Society of Composers, Authors and Publishers (ASCAP) and Broadcast Music, Inc. (BMI)."

275.    As part of their campaign, Defendants RMLC, TMLC and DiMA spearheaded the initiative to keep out new PROs by facilitating the formation of The Music Innovation Consumers Coalition ("**MIC**").

276.    MIC is a group of approximately fifteen members: DiMA, RMLC, TVMLC, WineAmerica, American Beverage Licensees, American Hotel & Lodging Association, Brewers Association, Computer & Communications Industry Association, Consumer Technology Association, International Association of Venue Managers, National Association of Broadcasters, National Association of Theatre of Owners, National Restaurant Association, National Religious Broadcasters Music License Committee, and National Retail Federation.

277.    PMR has sent offer letters in November 2019 to negotiate with American Beverage Licensees, Brewers Association, Consumer Technology Association, DiMA, National Retail

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

Federation, RMLC and TVMLC, but they either did not respond to PMR or they refused to negotiate with PMR.

278.    MIC, whose members are "united to be a powerful voice," is a go-to information resource for the purchasers of Licenses of musical works to know how to conduct their businesses, admittedly concerning competition and copyright laws. Upon information and belief, the Cartel controls MIC, is responsible for its published propaganda and has authorized it to make statements on the Cartel's behalf and interest.

279.    The MIC's boasted influence is not understated - collectively, the MIC's members paid a combined $2.2 billion in revenues that ASCAP and BMI collected in 2018.

280.    The Cartel uses MIC as a tool to further its anticompetitive agreement.

281.    Indeed, the Cartel wholeheartedly supports MIC's mission and any statement by MIC is a statement by or on behalf of the Cartel.  The Cartel has made its position clear that in the event of increased competition (e.g., by alleviating or ending the consent decrees), ASCAP and BMI will both increase their license fee demands.  What the Cartel has stated in various submissions to the DOJ is that any price, any term, any condition or any arrangement that is not substantively similar to what can currently be negotiated with BMI or ASCAP is unfair, unreasonable, or, as some have misleadingly argued, anticompetitive.

282.    In its public statements, MIC uses the same language as iHeartMedia, NRBML, Pandora, RMLC, Rhapsody and TVMLC, together with various co-conspirators: "[Users] are faced with a Hobson's Choice: either take every PRO license in order to perform ANY music, or take no license at all and forego live music." It also confirms why, "on behalf of the millions of businesses, both large and small, [it] represent[s]," the Cartel seeks to avoid new competition by PROs:

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

Permitting fractional licensing leaves licensees: (1) paying different rates for different fractions of the same songs; (2) uncertain about whether they have fully cleared any given song for performance (even if they have licenses from the major PROs); (3) dealing with the near-impossible prospect, given the lack of transparency in the industry, of having to track down fractional owners of works that are either affiliated with an unregulated PRO or not affiliated with an PRO; and (4) facing exposure to potential statutory damages for copyright infringement.

283.    MIC also published statements by its members, some of whom are Cartel members. For example, WineAmerica seeks to avoid having to "pay every PRO that represents a songwriter for a song with multiple writers: for example, if a song has four writers, each with a different PRO, then all for PRO could claim royalties for that single song." Others have used the similar phrase "weaponized uncertainty" of fractional ownership—which, for the avoidance of doubt, is not an unlawful practice under the Copyright Act.

284.    MIC has said, "Moreover, the recent decision by the U.S. Court of Appeals for the Second Circuit concluding that the consent decrees do not prohibit PROs from licensing their works on a fractional basis—requiring licensees to find and negotiate rights untold numbers of different owners for every song—has already created a major licensing hurdle that could drive many venues and services to simply forego music altogether."

285.    Conversely, the Cartel members should be competing with each other for access to quality works in various genres, as contained in the PMR Repertory. They are not, though. Instead, the Cartel has destroyed competition between and among themselves, trying to cease PMR's existence.

286.    With the MIC's influence and the Cartel's power, new PROs, like PMR, entering the free market have no chance of survival.

**C.**     **Cartel Engages in a Campaign to Communicate Falsehoods to Members**

287.     The Cartel wrongly propagates that PROs do not and cannot compete against each other. That is wrong. PROs do, can and should compete with each other because the Licenses from the PROs are substitutes for each other. For instance, an individual will consider the genre of music in deciding which nightclub or coffeehouse to attend. It does not matter whether a particular musical work will or will not be played, simply just that a particular genre (hip-hop, EDM, acoustic, country, etc.) is played. Further, listeners for generations have been listening to radio stations and television stations without having the choice to select the next song. The Streaming Defendants provide genre-based playlists, too.

288.     New PROs do not harm competition; they facilitate it. The RMLC Chairman, Ed Christian, stated that the music licensing arena is being tainted by the emergence of new PROs.  He alleged that new PROs seek to impose supra-competitive licensing fees upon the radio industry. In their August 9, 2019 joint submission to the DOJ, concerning the consent decrees, the RMLC and DiMA, in support of their position that the consent orders must be maintained, wrongly stated that no relevant circumstances have changed in the marketplace for public performance rights. The market is rapidly evolving with the entry of new PROs, chipping away at BMI and ASCAP's market power.

289.     RMLC, the TMLC, and "various digital music services" admitted that consent decrees outlive their usefulness when market conditions have changed to the point where a once-dominant player faces legitimate competition.  However, they boldly state to the DOJ that this circumstance is not true of the BMI and ASCAP consent decrees, plainly ignoring the existence of other PROs in the market. The truth is, the Cartel does not want BMI and ASCAP to face

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

legitimate competition because that would overturn the applecart and the cushy market the Cartel has built for itself.

290.     Other statements are instructive of the Cartel's strategy to brainwash the industry that it is the new PROs, not BMI and ASCAP which hold more than 90%+ of the market power, harming the Cartel. For example, NRBMLC, in its August 9, 2019 Public Comments submitted to the DOJ, stated that it had been harmed by smaller PROs such as SESAC and GMR. That is absurd. A Cartel co-conspirator, the American Beverage Licensees, in its August 9, 2019 Public Comments submitted to the DOJ, stated that PROs not subject to the consent decrees negatively impact buyers. That, too, is false.

291.     John Bodnovich, Executive Director of American Beverage Licensees, publicly stated that "relationships with PROs are one-sided, and not in favor of the business owner." He even went so far as to suggest to business owners that in light of the DOJ's consideration of terminating ASCAP and BMI's consent decrees, ignoring PROs was an option. That is false.

292.     Likewise, Ed Christian, the RMLC Chairman, boldly told radio stations that they could call a PRO's bluff by playing the musical works in its repertory and risk an infringement lawsuit.

293.     Maintenance of the anticompetitive agreement was emphasized in each and every communication to members concerning how to deal with new PROs. Cartel members were frequently lectured about the importance of not competing against each other based on price and tabs were kept on their licensing activity. The RMLC routinely disseminates information to radio stations regarding the status of its PRO negotiations. On at least one occasion, RMLC's Mr. Velez made presentations to several radio industry groups around the country, in which he "listed a lot

of these items as goals for the RMLC in our negotiations or litigations with ASCAP and BMI," and "g[a]ve the industry a report card as to how we fared on those particular goals."

294.     One of the goals listed in the presentation was a "substantial fee decrease." Mr. Velez reported to the radio industry that the RMLC had achieved the Cartel's objective in negotiations.

295.     In an industry e-mail dated November 22, 2016, the RMLC Chairman, Ed Christian – President and CEO of Saga Communications – advised members against paying GMR's proposed rates because they were one-third to over half of some radio stations' current payments to ASCAP or BMI and, in entering into a license with GMR under those prices, other PROs would use GMR agreements as benchmarks.  Mr. Christian made it clear that a free market would spell disaster for the Cartel.

296.     In a follow-up industry email dated November 28, 2016, Mr. Christian instructed members to "keep us in the loop" on any communications it has with GMR.

297.     On January 9, 2017, Mr. Christian was "troubled" that GMR was reportedly asserting that the interim license fee was "negotiated" with RMLC.

298.     On December 20, 2019, in a teleconference between the NRBMLC and PMR, the NRBMLC was similarly concerned by the use of the word "negotiation" and stated to PMR, in no uncertain terms, that the call was not to be construed as a license negotiation. The NRBMLC also inquired as to whether or not PMR had entered into licensing agreements with any Cartel Members.

**D.     The Cartel Has Substantial Opportunities to Communicate and Collude**

299.     The Cartel members belong to a web of different trade associations and participate in various meetings, forums, conferences, private meetings and industry conventions, all of which provide forums at which they can collude to formulate their anticompetitive agreements, which

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

includes refusal to deal with PMR and fix the prices and terms under which music is purchased from PROs.

300.     At these forums, Cartel members exchange information with each other about ongoing license negotiations, the final terms and conditions of such licenses, and the substance and circumstances arising from rate court proceedings, including competitively sensitive information such as license terms, pricing, rates and other usage data that the Cartel members should not be sharing with each other because they are horizontal competitors.

301.     Cartel members also discussed how to collectively treat SESAC, GMR and other emerging PROs, including PMR. These forums provide the Cartel with ample opportunity to meet, devise and implement a host of anticompetitive schemes that unreasonably restrain competition in the United States' performing rights market.

302.     For example, upon information and belief, representative and executives of the Cartel members met, or had the opportunity to meet, in person at the forums and events identified on Schedule 1 where they discussed the Cartel's anticompetitive agreement and refusal to deal with emerging PROs, including, in certain instances, PMR. Those meetings are in addition to the teleconference and email discussions among the Cartel members discussing, refining and entering into the anticompetitive agreement.

### E.     Anti-Competitive Negotiations with PMR

303.     No Cartel member has engaged in any legitimate negotiation with respect to a License with PMR.

304.     During any feigned participation, Cartel members mined PMR for confirmation no other Cartel member was trying to become, or had become, a traitor. The Cartel then used this

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

information to interfere with other pending negotiations by misrepresenting the status and content of their engagement and negotiations with PMR.

305.    The Cartel simply stopped responding to PMR's attempts to negotiate in good faith in 2019.

306.    By late 2019, despite repeated outreaches from PMR, the Cartel had become increasingly non-responsive to PMR.

307.    The Cartel deliberately obfuscated the substance of their discussions with PMR, including misrepresenting PMR's positions during those discussions to other Cartel members. For instance, after having a discussion with one Cartel member, another Cartel member would tell PMR what it heard from other Cartel members.

**F.    Refusal to Deal**

308.    Defendants and their co-conspirators outright refused to purchase licenses from PMR.

309.    Defendants discussed their general desires to restrain trade in the performing rights market and came to a resolution on how to stop the advancement and survival of any new and unregulated PRO, including but not limited to PMR.

310.    The unanimous agreement was this: do not discuss the possibility of a license with PMR; do not negotiate independently with PMR; and, above all, act consistently with each other for the betterment of the Cartel.

**G.    Group Boycott**

311.    Defendants have steadfastly refused to negotiate with PMR regarding license fees, terms or conditions for Defendant's members. In fact, WineAmerica took the "ignore PMR" directive to a whole new level, rejected receipt of PMR's letter from the U.S. postal service.

65

GORA LLC
2 CORPORATE DR., SUITE 210 •TRUMBULL, CT •06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

312.     That ultimately not a single Defendant would even discuss or consider a license or even acknowledge PMR's letters or efforts to grant licenses before this antitrust action was filed shows the uniformity of illegal conduct.

313.     The purpose of antitrust laws is to promote and protect competition.  PMR has a legal right to compete within the market and not to be controlled by this illegal cartel and be boycotted by Defendants if it does not operate within their anti-competitive terms.

### H.    The End-User Listeners Will Not Be Harmed

314.     Disbanding the monopsony will not harm the end-user listeners.  Each of the Streaming Defendants provide a basis to listen to musical works on their platforms for free.

315.     If the Streaming Defendants have to buy a License from PMR, none of them will discontinue the free service and risk losing low-cost customer acquisition tools.

316.     Also, the Streaming Defendants have, in the past, increased rates for subscriptions to their music streaming services. After doing so, the Streaming Defendants continued to experience growth in end-user listeners.

317.     Lastly, the Streaming Defendants have likewise increased the rate to advertise on their music streaming services.

## VI.    EFFECT OF THE CARTEL'S HORIZONTAL CONSPIRACIES

### A.    Injury to Competition

318.     The Cartel's price-fixing, refusal to deal and boycott have seriously harmed the competitive process by eliminating competition between radio stations and doing away with the free market.

GORA LLC
2 CORPORATE DR., SUITE 210 •TRUMBULL, CT •06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

319.    PMR is the only PRO not subject to a consent decree, not subject to terms and conditions substantively similar to the consent decrees, and not subject to an existing antitrust lawsuit by a Cartel member.

**B.      Restricted Songwriter and Publisher Choice**

320.    The infracompetitive prices agreed upon by the Cartel generate unjustified wealth transfers from songwriters and publishers to Cartel members, and inefficiently distort behavior both in the market for PMR's Repertory of copyrighted music and beyond.

321.    The ASCAP and BMI rates significantly undervalue the works of songwriters, composers and publishers.

322.    If the PRO market is capped at a duopoly or to only a few players at the abysmally low current rates, the volume of available music gets capped. There would be potential for more songwriters if only they could make a living penning songs. New competitors in the market inevitably increases supply. That is how free market functions.

323.    Were it not for the Cartel's antitrust violations, songwriters, composers and music publishers could join PROs with licensing arrangements that differ in an accretive way from those which are offered by ASCAP and BMI.

324.    As it stands now, PMR songwriters, composers and publishers do not have access to the radio, television and other media outlets that are crucial to their financial and reputational success.

**C.      Restricted Consumer Choice**

325.    End-user listeners are harmed by reduced demand for and consequently the output of new musical works.

326.     End-user listeners seek out new musical works by both unknown and/or emerging artists, which have made Justin Bieber (Grammy winner, 10-time nominee), Post Malone (6-time Grammy nominee), Ed Sheeran (4-time Grammy winner, 14-time nominee), Shawn Mendes (3-time Grammy nominee), Soulja Boy (1-time Grammy nominee; a musical work in the PMR Repertory) The Weeknd (3-time Grammy winner, 10-time nominee) and Billie Eilish (5-time Grammy winner, 6-time nominee) overnight successes. However, the Cartel seeks to control the music offered to the end-user listeners, and cripple new services and technology offerings. By not purchasing a License from PMR for anti-competitive reasons, such listeners cannot request or play any new musical works from unknown and/or emerging artists in PMR's Repertory—stifling creativity and blocking discovery of the next overnight successes.

327.     Ultimately, there is an overall reduction in the musical library universe since songwriters have no incentive to create new music if they are not adequately compensated for their work.

**D.     <u>Antitrust Injury to PMR</u>**

328.     As a direct and proximate result of the aforesaid conspiracies, PMR has been unable to negotiate performance rights licenses with the Cartel or its co-conspirators on terms and conditions which would have been established by the forces of supply and demand in an unrestrained market. To do otherwise would result in selling its product at a loss.

329.     Because PMR has been unable to consummate a license with any Cartel member or its co-conspirators, it has been prevented from obtaining royalties and other compensation it would otherwise have received under a license.

330.     PMR, having been injured in its business and property by reason of the restraint of trade described above and forbidden by Sections 1 and 2 of the Sherman Act, is entitled to recover

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

treble lost profits, loss value, and other damages it has sustained, as well as the other remedies provided under the Sherman Act.

331.    Unless restrained by this Court, PMR is threatened with continuous injury or loss due to the effect of the unlawful horizontal agreements alleged herein.

## VII.    CONSPIRACY TO MONOPSONIZE

332.    The Cartel has conspired for the anticompetitive purpose of obtaining unlawful monopsony power within the performing rights market so as to eliminate competition between themselves in the acquisition of licenses from PMR and also for the anticompetitive purpose and with the effect of obtaining and maintaining the power to control the royalty rate (i.e. prices) and terms and conditions under which music would be licensed and to anti-competitively drive down the competitive rate that would otherwise be paid. They have also monopsonized and attempted to monopsonize in violation of Section 2 of the Sherman Act.

333.    The relevant product market is the market for public performance licenses to copyrighted music by terrestrial radio stations, commercial television stations, and music streaming services.

334.    The relevant geographic market is the United States. Defendants do not limit their purchases of licenses to copyrights to any one part of the country; they purchase licenses all over the United States.

## VIII.    MAINTENANCE OF MONOPSONY BY EXCLUSIONARY PRACTICES

335.    Defendants have unlawfully accumulated and maintained monopsony power over the relevant market and have used the monopsony power to prevent PMR from being able to license its music at competitive market rates and, ultimately, refused to deal with PMR at any price.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

336.    Defendant's unlawful conduct alleged herein has been undertaken for the anticompetitive purpose of obtaining or maintaining monopsony power over the terms and conditions upon which PMR can license its music to buyers thereof.  Unless restrained by this Court, there is a dangerous likelihood that Defendants will succeed in the illegal scheme and enhance their monopsony power within the relevant market alleged herein in violation of Section 2 of the Sherman Act.

337.    Through anti-competitive conduct, Defendants have obtained and maintained monopsony power which allows them to control the terms and conditions upon which music is licensed, all to the exclusion of competition for licenses to monopsonize the market alleged herein in violation of Section 2 of the Sherman Act.

## IX.    CAUSES OF ACTION

### COUNT 1
**(Horizontal Price-fixing in Violation of Section 1 of the Sherman Act)**
**(Streaming Defendants)**

338.    Plaintiff incorporates by reference Paragraphs 1-337 as if fully stated herein.

339.    Beginning at least as early as January 1, 2018, and continuing to date, the Streaming Defendants have engaged in a conspiracy and agreement to restrain interstate trade and commerce which constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely to continue unless the relief requested is granted.

340.    Streaming Defendants have conspired and agreed to fix and control copyright license fees to avoid competition between and among themselves in the market for public performance licenses to copyrighted music for music streaming services.

341.    The Streaming Defendants collectively account for more than 85% of the revenue in the relevant market.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

342.     The horizontal price-fixing agreement also resulted in clear anticompetitive effects on songwriters and publishers in the public performance rights market by depriving them of the benefits of competition.  The anticompetitive effects of Streaming Defendants' conduct and the potential for continuing and future anticompetitive effects outweigh any conceivable efficiencies deriving from their conduct.

343.     Where, as here, Streaming Defendants have engaged in *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market or market power are required.

344.     Streaming Defendants and their co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by Streaming Defendants, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

345.     Streaming Defendants and their co-conspirators are also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of its willful and intentional violation of the Sherman Act as set forth above.

## COUNT 2
### (Horizontal Price-fixing in Violation of Section 1 of the Sherman Act)
### (RMLC)

346.     Plaintiff incorporates by reference Paragraphs 1-345 as if fully stated herein.

GORA LLC
2 CORPORATE DR. • SUITE 210 • TRUMBULL, CT • 06611 • 203-424-8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

347.     Beginning at least as early as January 1, 2018, and continuing to date, RMLC has engaged in a conspiracy and agreement to restrain interstate trade and commerce which constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely to continue unless the relief requested is granted.

348.     RMLC has conspired and agreed to fix and control copyright license fees to avoid competition between and among its radio station members in the market for public performance licenses to copyrighted music for radio stations.

349.     The radio stations RMLC represents collectively account for more than 85% of the revenue in the relevant market.

350.     The horizontal price-fixing agreement also resulted in clear anticompetitive effects on songwriters and publishers in the public performance rights market by depriving them of the benefits of competition.  The anticompetitive effects of RMLC's conduct and the potential for continuing and future anticompetitive effects outweigh any conceivable efficiencies deriving from its conduct.

351.     Where, as here, RMLC has engaged in *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market or market power are required.

352.     RMLC and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by RMLC, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment

interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

353.     RMLC and its co-conspirators are also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of their willful and intentional violation of the Sherman Act as set forth above.

**COUNT 3**
**(Horizontal Price-fixing in Violation of Section 1 of the Sherman Act)**
**(TVMLC)**

354.     Plaintiff incorporates by reference Paragraphs 1-353 as if fully stated herein.

355.     Beginning at least as early as January 1, 2018, and continuing to date, TVMLC has engaged in a conspiracy and agreement to restrain interstate trade and commerce which constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely to continue unless the relief requested is granted.

356.     TVMLC has conspired and agreed to fix and control copyright license fees to avoid competition between and among itself and its television stations in the market for public performance licenses to copyrighted music for commercial television stations.

357.     The radio stations TVMLC represents collectively account for more than 85% of the revenue in the relevant market.

358.     The horizontal price-fixing agreement also resulted in clear anticompetitive effects on songwriters and publishers in the public performance rights market by depriving them of the benefits of competition.  The anticompetitive effects of TVMLC's conduct and the potential for continuing and future anticompetitive effects outweigh any conceivable efficiencies deriving from its conduct.

GORA LLC
2 CORPORATE DR., SUITE 210 •TRUMBULL, CT •06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

359.     Where, as here, TVMLC has engaged in *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market or market power are required.

360.     TVMLC and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by TVMLC, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

361.     TVMLC and its co-conspirators are also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of its willful and intentional violation of the Sherman Act as set forth above.

## COUNT 4
### (Horizontal Price-fixing in Violation of Section 1 of the Sherman Act)
### (DiMA)

362.     Plaintiff incorporates by reference Paragraphs 1-361 as if fully stated herein.

363.     Beginning at least as early as January 1, 2018, and continuing to date, DiMA has engaged in a conspiracy and agreement to restrain interstate trade and commerce which constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely to continue unless the relief requested is granted.

364.     DiMA has conspired and agreed to fix and control copyright license fees to avoid competition between and among itself and its music streaming services in the market for public performance licenses to copyrighted music for music streaming services.

365.    The music streaming services that DiMA represents collectively account for more than 85% of the revenue in the relevant market.

366.    The horizontal price-fixing agreement also resulted in clear anticompetitive effects on songwriters and publishers in the public performance rights market by depriving them of the benefits of competition.  The anticompetitive effects of DiMA's conduct and the potential for continuing and future anticompetitive effects outweigh any conceivable efficiencies deriving from its conduct.

367.    Where, as here, DiMA has engaged in *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market or market power are required.

368.    DiMA and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by DiMA, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

369.    DiMA and its co-conspirators are also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of its willful and intentional violation of the Sherman Act as set forth above.

## COUNT 5
### (Horizontal Price-fixing in Violation of Section 1 of the Sherman Act)
### (NRBMLC)

370.    Plaintiff incorporates by reference Paragraphs 1-369 as if fully stated herein.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

371.    Beginning at least as early as January 1, 2018, and continuing to date, NRBMLC has engaged in a conspiracy and agreement to restrain interstate trade and commerce which constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely to continue unless the relief requested is granted.

372.    NRBMLC has conspired and agreed to fix and control copyright license fees to avoid competition between and among itself and its music streaming services in the market for public performance licenses to copyrighted music for religious radio stations.

373.    The horizontal price-fixing agreement also resulted in clear anticompetitive effects on songwriters and publishers in the public performance rights market by depriving them of the benefits of competition.  The anticompetitive effects of NRBMLC's conduct and the potential for continuing and future anticompetitive effects outweigh any conceivable efficiencies deriving from its conduct.

374.    Where, as here, NRBMLC has engaged in *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market or market power are required.

375.    NRBMLC and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by NRBMLC, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

376.    NRBMLC and its co-conspirators are also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of its willful and intentional violation of the Sherman Act as set forth above.

### COUNT 6
### (Horizontal Price-fixing in Violation of Section 1 of the Sherman Act)
### (WineAmerica)

377.    Plaintiff incorporates by reference Paragraphs 1-376 as if fully stated herein.

378.    Beginning at least as early as January 1, 2018, and continuing to date, WineAmerica has engaged in a conspiracy and agreement to restrain interstate trade and commerce which constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely to continue unless the relief requested is granted.

379.    WineAmerica has conspired and agreed to fix and control copyright license fees to avoid competition between and among itself and its members in the market for public performance licenses to copyrighted music for wineries.

380.    The wineries that WineAmerica represents collectively account for more than, upon information and belief, 75% of the revenue in the relevant market.

381.    The horizontal price-fixing agreement also resulted in clear anticompetitive effects on songwriters and publishers in the public performance rights market by depriving them of the benefits of competition.  The anticompetitive effects of WineAmerica's conduct and the potential for continuing and future anticompetitive effects outweigh any conceivable efficiencies deriving from its conduct.

382.    Where, as here, WineAmerica has engaged in *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market or market power are required.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

383.     WineAmerica and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by WineAmerica, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

384.     WineAmerica and its co-conspirators is also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of its willful and intentional violation of the Sherman Act as set forth above.

### COUNT 7
### (Horizontal Price-fixing in Violation of Section 1 of the Sherman Act)
### (iHeartMedia and Connoisseur Media)

385.     Plaintiff incorporates by reference Paragraphs 1-384 as if fully stated herein.

386.     Beginning at least as early as January 1, 2018, and continuing to date, iHeartMedia and Connoisseur Media have engaged in a conspiracy and agreement to restrain interstate trade and commerce which constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  This offense is likely to continue unless the relief requested is granted.

387.     iHeartMedia and Connoisseur Media have conspired and agreed to fix and control copyright license fees to avoid competition between and themselves.

388.     The horizontal price-fixing agreement also resulted in clear anticompetitive effects on songwriters and publishers in the public performance rights market by depriving them of the benefits of competition.   The anticompetitive effects of the conduct of iHeartMedia and

Connoisseur Media and the potential for continuing and future anticompetitive effects outweigh any conceivable efficiencies deriving from their conduct.

389.    Where, as here, iHeartMedia and Connoisseur Media have engaged in *per se* violation of Section 1 of the Sherman Act, no allegations with respect to the relevant product market, geographic market or market power are required.

390.    iHeartMedia and Connoisseur Media and their co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by iHeartMedia and Connoisseur Media, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

391.    iHeartMedia and Connoisseur Media and their co-conspirators are also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of their willful and intentional violation of the Sherman Act as set forth above.

**COUNT 8**
**(Group Boycott/Refusal to Deal in Violation of Section 1 of the Sherman Act)**
**(Streaming Defendants)**

392.    Plaintiff incorporates by reference Paragraphs 1-391 as if fully stated herein.

393.    Beginning at least as early as January 1, 2018, and continuing to date, by virtue of their agreed conduct to refuse to deal with and engage in a group boycott of PMR, Streaming Defendants and their co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

undertaken by Streaming Defendants, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

394.   Streaming Defendants are also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of their willful and intentional violation of the Sherman Act as set forth above.

## COUNT 9
### (Group Boycott/Refusal to Deal in Violation of Section 1 of the Sherman Act)
### (RMLC)

395.   Plaintiff incorporates by reference Paragraphs 1-394 as if fully stated herein.

396.   Beginning at least as early as January 1, 2018, and continuing to date, by virtue of their agreed conduct to refuse to deal with and engage in a group boycott of PMR, RMLC, and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by RMLC, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

397.   RMLC and its co-conspirators are jointly liable to Plaintiff for punitive damages under common law of Connecticut in consideration of their willful and intentional violation of the Sherman Act as set forth above.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**COUNT 10**
**(Group Boycott/Refusal to Deal in Violation of Section 1 of the Sherman Act)**
**(TVMLC)**

398.    Plaintiff incorporates by reference Paragraphs 1-397 as if fully stated herein.

399.    Beginning at least as early as January 1, 2018, and continuing to date, by virtue of their agreed conduct to refuse to deal with and engage in a group boycott of PMR, TVMLC and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by TVMLC, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

400.    TVMLC is also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of their willful and intentional violation of the Sherman Act as set forth above.

**COUNT 11**
**(Group Boycott/Refusal to Deal in Violation of Section 1 of the Sherman Act)**
**(DiMA)**

401.    Plaintiff incorporates by reference Paragraphs 1-400 as if fully stated herein.

402.    Beginning at least as early as January 1, 2018, and continuing to date, by virtue of their agreed conduct to refuse to deal with and engage in a group boycott of PMR, DiMA and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by DiMA, in an amount to be proven at the trial hereof, together with a further amount reflecting

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

403.    DiMA is also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of their willful and intentional violation of the Sherman Act as set forth above.

**COUNT 12**
**(Group Boycott/Refusal to Deal in Violation of Section 1 of the Sherman Act)**
**(NRBMLC)**

404.    Plaintiff incorporates by reference Paragraphs 1-403 as if fully stated herein.

405.    Beginning at least as early as January 1, 2018, and continuing to date, by virtue of their agreed conduct to refuse to deal with and engage in a group boycott of PMR, NRBMLC and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by NRBMLC, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

406.    NRBMLC and its co-conspirators are also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of their willful and intentional violation of the Sherman Act as set forth above.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**COUNT 13**
**(Group Boycott/Refusal to Deal in Violation of Section 1 of the Sherman Act)**
**(WineAmerica)**

407.    Plaintiff incorporates by reference Paragraphs 1-406 as if fully stated herein.

408.    Beginning at least as early as January 1, 2018, and continuing to date, by virtue of their agreed conduct to refuse to deal with and engage in a group boycott of PMR, WineAmerica and its co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by WineAmerica, in an amount to be proven at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

409.    WineAmerica and its co-conspirators are also liable to Plaintiff for punitive damages under common law of Connecticut in consideration of their willful and intentional violation of the Sherman Act as set forth above.

**COUNT 14**
**(Group Boycott/Refusal to Deal in Violation of Section 1 of the Sherman Act)**
**(iHeartMedia and Connoisseur Media)**

410.    Plaintiff incorporates by reference Paragraphs 1-409 as if fully stated herein.

411.    Beginning at least as early as January 1, 2018, and continuing to date, by virtue of their agreed conduct to refuse to deal with and engage in a group boycott of PMR, iHeartMedia and Connoisseur Media and their co-conspirators are each liable jointly and severally to the Plaintiff for treble the amount of damages and losses caused to Plaintiff by unreasonable and illegal restraints of trade undertaken by iHeartMedia and Connoisseur Media, in an amount to be proven

GORA LLC
2 CORPORATE DR., SUITE 210 •TRUMBULL, CT •06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

at the trial hereof, together with a further amount reflecting treble the further losses and damages suffered as a result of any continuation of the same conduct during the pendency of this litigation, and statutory pre-judgment interest from the date of the service of the complaint herein, and attorneys' fees and other costs of proceeding with the litigation instituted herein, all pursuant to 15 U.S.C. § 15(a).

412.    iHeartMedia and Connoisseur Media and their co-conspirators are jointly liable to Plaintiff for punitive damages under common law of Connecticut in consideration of their willful and intentional violation of the Sherman Act as set forth above.

**COUNT 15**
**(Sherman Act Section 2 Violation: Monopsonization)**
**(Streaming Defendants)**

413.    Plaintiff incorporates by reference Paragraphs 1-412 as if fully stated herein.

414.    At all times relevant to this complaint, Streaming Defendants have monopsony power over the performance rights license market for music streaming services in the United States and refuse to deal with and are engaging in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by Streaming Defendants' conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

415.    Streaming Defendants possess monopsony power in the relevant market and have abused and continue to abuse that power to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

416.    As a direct and proximate result of the continuing violation of Section 2 of the Sherman Act by Streaming Defendants and their co-conspirators, each of whom is jointly and

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

severally liable, Plaintiff has suffered antitrust injury and damages in an amount to be proven at trial.

417.    The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

418.    As a direct and proximate result of Streaming Defendants' unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

419.    Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

### COUNT 16
### (Sherman Act Section 2 Violation: Monopsonization)
### (RMLC)

420.    Plaintiff incorporates by reference Paragraphs 1-419 as if fully stated herein.

421.    At all times relevant to this complaint, RMLC has monopsony power over the performance rights license market for its radio stations in the United States and refuses to deal with and is engaging in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by its conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

422.    RMLC possesses monopsony power in the relevant market and has abused and continues to abuse that power to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

423.    As a direct and proximate result of the continuing violation of Section 2 of the Sherman Act by RMLC and its co-conspirators, each of whom is jointly and severally liable, Plaintiff has suffered antitrust injury and damages in an amount to be proven at trial.

424.    The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

425.    As a direct and proximate result of RMLC's, iHeartMedia's and Connoisseur Media's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

426.    Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT 17
### (Sherman Act Section 2 Violation: Monopsonization)
### (TVMLC)

427.    Plaintiff incorporates by reference Paragraphs 1-426 as if fully stated herein.

428.    At all times relevant to this complaint, TVMLC has monopsony power over the performance rights license market for its television stations in the United States and refuses to deal with and is engaging in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by TVMLC's

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

429.    TVMLC possesses monopsony power in the relevant market and has abused and continues to abuse that power to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

430.    As a direct and proximate result of the continuing violation of Section 2 of the Sherman Act by TVMLC and its co-conspirators, each of whom is jointly and severally liable, Plaintiff has suffered antitrust injury and damages in an amount to be proven at trial.

431.    The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

432.    As a direct and proximate result of TVMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

433.    Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT 18**
**(Sherman Act Section 2 Violation: Monopsonization)**
**(DiMA)**

434.    Plaintiff incorporates by reference Paragraphs 1-433 as if fully stated herein.

435.    At all times relevant to this complaint, DiMA has monopsony power over the performance rights license market for its members in the United States and refuses to deal with and is engaging in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT •06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

performance rights licenses except at prices that were fixed and artificially depressed by DiMA's conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

436.   DiMA possesses monopsony power in the relevant market and has abused and continues to abuse that power to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

437.   As a direct and proximate result of the continuing violation of Section 2 of the Sherman Act by DiMA and its co-conspirators, each of which is jointly and severally liable, Plaintiff has suffered antitrust injury and damages in an amount to be proven at trial.

438.   The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

439.   As a direct and proximate result of DiMA's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

440.   Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT 19**
**(Sherman Act Section 2 Violation: Monopsonization)**
**(NRBMLC)**

441.   Plaintiff incorporates by reference Paragraphs 1-440 as if fully stated herein.

442.   At all times relevant to this complaint, NRBMLC has monopsony power over the performance rights license market for its members in the United States and refuses to deal with and is engaging in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid

for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by NRBMLC's conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

443.    NRBMLC possesses monopsony power in the relevant market and has abused and continues to abuse that power to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

444.    As a direct and proximate result of the continuing violation of Section 2 of the Sherman Act by NRBMLC and its co-conspirators, each of which is jointly and severally liable, Plaintiff has suffered antitrust injury and damages in an amount to be proven at trial.

445.    The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

446.    As a direct and proximate result of NRBMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

447.    Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT 20**
**(Sherman Act Section 2 Violation: Monopsonization)**
**(WineAmerica)**

448.    Plaintiff incorporates by reference Paragraphs 1-447 as if fully stated herein.

449.    At all times relevant to this complaint, WineAmerica has monopsony power over the performance rights license market for its members in the United States and refuses to deal with

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

and is engaging in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by WineAmerica's conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

450.    WineAmerica possesses monopsony power in the relevant market and has abused and continues to abuse that power to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

451.    As a direct and proximate result of the continuing violation of Section 2 of the Sherman Act by WineAmerica and its co-conspirators, each of which is jointly and severally liable, Plaintiff has suffered antitrust injury and damages in an amount to be proven at trial.

452.    The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

453.    As a direct and proximate result of WineAmerica's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

454.    Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

### COUNT 21
### (Sherman Act Section 2 Violation: Attempt to Monopsonize)
### (Streaming Defendants)

455.    Plaintiff incorporates by reference Paragraphs 1-454 as if fully stated herein.

456.    At all times relevant to this complaint, Streaming Defendants have willfully, knowingly and intentionally conspired with the specific intent to monopsonize the performance rights license market for music streaming services in the United States and refuse to deal with and engage in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by Streaming Defendants' conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

457.    Streaming Defendants have attempted and continue to attempt to possess monopsony power in the relevant market and maintain a dominant position therein to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

458.    As a direct and proximate result of the continuing violation of Section 2 of the Sherman Act by Streaming Defendants and their co-conspirators, each of whom is jointly and severally liable, Plaintiff has suffered antitrust injury and damages in an amount to be proven at trial.

459.    The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

460.    As a direct and proximate result of Streaming Defendants' unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

461.    Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT 22**
**(Sherman Act Section 2 Violation: Attempt to Monopsonize)**
**(RMLC)**

462.    Plaintiff incorporates by reference Paragraphs 1-461 as if fully stated herein.

463.    At all times relevant to this complaint, RMLC has willfully, knowingly and intentionally conspired with the specific intent to monopsonize the performance rights license market for its radio stations in the United States and refuse to deal with and engage in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by RMLC's conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

464.    RMLC has attempted and continues to attempt to possess monopsony power in the relevant market and maintain a dominant position therein to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

465.    The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

466.    As a direct and proximate result of RMLC's, iHeartMedia's and Connoisseur Media's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

467.     Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT 23
### (Sherman Act Section 2 Violation: Attempt to Monopsonize)
### (TVMLC)

468.     Plaintiff incorporates by reference Paragraphs 1-467 as if fully stated herein.

469.     At all times relevant to this complaint, TVMLC has willfully, knowingly and intentionally conspired with the specific intent to monopsonize the performance rights license market for its television stations in the United States and refuse to deal with and engage in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by TVMLC's conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

470.     TVMLC has attempted and continues to attempt to possess monopsony power in the relevant market and maintain a dominant position therein to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

471.     The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

472.     As a direct and proximate result of TVMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

473. Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

**COUNT 24**
**(Sherman Act Section 2 Violation: Attempt to Monopsonize)**
**(DiMA)**

474. Plaintiff incorporates by reference Paragraphs 1-473 as if fully stated herein.

475. At all times relevant to this complaint, DiMA has willfully, knowingly and intentionally conspired with the specific intent to monopsonize the performance rights license market for its members in the United States and refuse to deal with and engage in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by DiMA's conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

476. DiMA has attempted and continues to attempt to possess monopsony power in the relevant market and maintain a dominant position therein to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

477. The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

478. As a direct and proximate result of DiMA's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

479.    Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT 25
### (Sherman Act Section 2 Violation: Attempt to Monopsonize)
### (NRBMLC)

480.    Plaintiff incorporates by reference Paragraphs 1-479 as if fully stated herein.

481.    At all times relevant to this complaint, NRBMLC has willfully, knowingly and intentionally conspired with the specific intent to monopsonize the performance rights license market for its members in the United States and refuse to deal with and engage in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by NRBMLC'S conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

482.    NRBMLC has attempted and continues to attempt to possess monopsony power in the relevant market and maintain a dominant position therein to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

483.    The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

484.    As a direct and proximate result of NRBMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

485.     Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT 26
### (Sherman Act Section 2 Violation: Attempt to Monopsonize)
### (WineAmerica)

486.     Plaintiff incorporates by reference Paragraphs 1-485 as if fully stated herein.

487.     At all times relevant to this complaint, WineAmerica has willfully, knowingly and intentionally conspired with the specific intent to monopsonize the performance rights license market for its members in the United States and refuse to deal with and engage in a group boycott of PMR and thereby to depress, fix and stabilize the prices paid for performance rights licenses and to ensure that all PROs would be unable to market their performance rights licenses except at prices that were fixed and artificially depressed by TVMLC's conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

488.     WineAmerica has attempted and continues to attempt to possess monopsony power in the relevant market and maintain a dominant position therein to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market.

489.     The foregoing conduct is a per se violation of Section 2 of the Sherman Act. In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

490.     As a direct and proximate result of WineAmerica's unlawful conduct, PMR has suffered damages in an amount to be proved at trial. Such damages represent the amount Plaintiff would have received for the sale of performance rights licenses in the absence of the violation. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

GORA LLC
2 CORPORATE DR., SUITE 210 •TRUMBULL, CT •06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

491.     Plaintiff also seeks injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT 27
### (Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-26)
### (Streaming Defendants)

492.     Plaintiff incorporates by reference Paragraphs 1-491 as if fully stated herein.

493.     Streaming Defendants' conspiracy to engage in price-fixing and to boycott and refuse to deal with PMR are agreements in restraint of trade, in violation of Section 35-26 of the Connecticut Antitrust Act.

494.     As a direct and proximate result of Streaming Defendants' unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

## COUNT 28
### (Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-26)
### (RMLC)

495.     Plaintiff incorporates by reference Paragraphs 1-494 as if fully stated herein.

496.     RMLC's conspiracy to engage in price-fixing and to boycott and refuse to deal with PMR are agreements in restraint of trade, in violation of Section 35-26 of the Connecticut Antitrust Act.

497.     As a direct and proximate result of RMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

**COUNT 29**
**(Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-26)**
**(TVMLC)**

498.    Plaintiff incorporates by reference Paragraphs 1-497 as if fully stated herein.

499.    TVMLC's conspiracy to engage in price-fixing and to boycott and refuse to deal with PMR are agreements in restraint of trade, in violation of Section 35-26 of the Connecticut Antitrust Act.

500.    As a direct and proximate result of TVMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

**COUNT 30**
**(Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-26)**
**(DiMA)**

501.    Plaintiff incorporates by reference Paragraphs 1-500 as if fully stated herein.

502.    DiMA's conspiracy to engage in price-fixing and to boycott and refuse to deal with PMR are agreements in restraint of trade, in violation of Section 35-26 of the Connecticut Antitrust Act.

503.    As a direct and proximate result of DiMA's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

**COUNT 31**
**(Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-26)**
**(NRBMLC)**

504.    Plaintiff incorporates by reference Paragraphs 1-503 as if fully stated herein.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

505.    NRBMLC's conspiracy to engage in price-fixing and to boycott and refuse to deal with PMR are agreements in restraint of trade, in violation of Section 35-26 of the Connecticut Antitrust Act.

506.    As a direct and proximate result of NRBMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

### COUNT 32
### (Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-26)
### (WineAmerica)

507.    Plaintiff incorporates by reference Paragraphs 1-506 as if fully stated herein.

508.    WineAmerica's conspiracy to engage in price-fixing and to boycott and refuse to deal with PMR are agreements in restraint of trade, in violation of Section 35-26 of the Connecticut Antitrust Act.

509.    As a direct and proximate result of WineAmerica's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

### COUNT 33
### (Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-26)
### (iHeartRadio and Connoisseur Media)

510.    Plaintiff incorporates by reference Paragraphs 1-509 as if fully stated herein.

511.    iHeartRadio's and Connoisseur Media's conspiracy to engage in price-fixing and to boycott and refuse to deal with PMR are agreements in restraint of trade, in violation of Section 35-26 of the Connecticut Antitrust Act.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

512.    As a direct and proximate result of iHeartRadio's and Connoisseur Media's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

## COUNT 34
### (Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-28)
### (Streaming Defendants)

513.    Plaintiff incorporates by reference Paragraphs 1-512 as if fully stated herein.

514.    Streaming Defendants' conspiracy had the purpose and/or effect of a) fixing, controlling, or maintaining prices, rates or fees in the performing rights market; b) fixing, controlling, maintaining, limiting the supply of music; c) boycotting PMR and d) refusing to deal, or coercing, persuading, or inducing its members to refuse to deal with PMR.

515.    As a direct and proximate result of Streaming Defendants' unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

## COUNT 35
### (Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-28)
### (RMLC)

516.    Plaintiff incorporates by reference Paragraphs 1-515 as if fully stated herein.

517.    RMLC's conspiracy had the purpose and/or effect of a) fixing, controlling, or maintaining prices, rates or fees in the performing rights market; b) fixing, controlling, maintaining, limiting the supply of music; c) boycotting PMR and d) refusing to deal, or coercing, persuading, or inducing its members to refuse to deal with PMR.

518.    As a direct and proximate result of RMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

## COUNT 36
### (Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-28)
### (TVMLC)

519.    Plaintiff incorporates by reference Paragraphs 1-518 as if fully stated herein.

520.    TVMLC's conspiracy had the purpose and/or effect of a) fixing, controlling, or maintaining prices, rates or fees in the performing rights market; b) fixing, controlling, maintaining, limiting the supply of music; c) boycotting PMR and d) refusing to deal, or coercing, persuading, or inducing its members to refuse to deal with PMR.

521.    As a direct and proximate result of TVMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

## COUNT 37
### (Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-28)
### (DiMA)

522.    Plaintiff incorporates by reference Paragraphs 1-521 as if fully stated herein.

523.    DiMA's conspiracy had the purpose and/or effect of a) fixing, controlling, or maintaining prices, rates or fees in the performing rights market; b) fixing, controlling, maintaining, limiting the supply of music; c) boycotting PMR and d) refusing to deal, or coercing, persuading, or inducing its members to refuse to deal with PMR.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

524.   As a direct and proximate result of DiMA's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

## COUNT 38
**(Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-28)**
**(NRBMLC)**

525.   Plaintiff incorporates by reference Paragraphs 1-524 as if fully stated herein.

526.   NRBMLC's conspiracy had the purpose and/or effect of a) fixing, controlling, or maintaining prices, rates or fees in the performing rights market; b) fixing, controlling, maintaining, limiting the supply of music; c) boycotting PMR and d) refusing to deal, or coercing, persuading, or inducing its members to refuse to deal with PMR.

527.   As a direct and proximate result of NRBMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

## COUNT 39
**(Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-28)**
**(WineAmerica)**

528.   Plaintiff incorporates by reference Paragraphs 1-527 as if fully stated herein.

529.   WineAmerica's conspiracy had the purpose and/or effect of a) fixing, controlling, or maintaining prices, rates or fees in the performing rights market; b) fixing, controlling, maintaining, limiting the supply of music; c) boycotting PMR and d) refusing to deal, or coercing, persuading, or inducing its members to refuse to deal with PMR.

530.   As a direct and proximate result of WineAmerica's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

## COUNT 40
### (Violation of Connecticut Antitrust Act, Conn. Gen. Statute § 35-28)
### (iHeartMedia and Connoisseur Media)

531.    Plaintiff incorporates by reference Paragraphs 1-530 as if fully stated herein.

532.    iHeartMedia's and Connoisseur Media's conspiracy had the purpose and/or effect of a) fixing, controlling, or maintaining prices, rates or fees in the performing rights market; b) fixing, controlling, maintaining, limiting the supply of music; c) boycotting PMR and d) refusing to deal, or coercing, persuading, or inducing its members to refuse to deal with PMR.

533.    As a direct and proximate result of iHeartMedia's and Connoisseur Media's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to treble damages, together with a reasonable attorney's fee and costs.

## COUNT 41
### (Violation of Connecticut Unfair and Deceptive Trade Practices Act)
### (Streaming Defendants)

534.    Plaintiff incorporates by reference Paragraphs 1-533 as if fully stated herein.

535.    Streaming Defendants engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*

536.    Streaming Defendants knew or should have known their conduct violated Conn. Gen. Stat. § 42-110b.

537.    As a direct and proximate result of Streaming Defendants' unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to punitive damages, together with a reasonable attorney's fee and costs.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**COUNT 42**
**(Violation of Connecticut Unfair and Deceptive Trade Practices Act)**
**(RMLC)**

538.   Plaintiff incorporates by reference Paragraphs 1-537 as if fully stated herein.

539.   RMLC engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*

540.   RMLC knew or should have known its conduct violated Conn. Gen. Stat. § 42-110b.

541.   As a direct and proximate result of RMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to punitive damages, together with a reasonable attorney's fee and costs.

**COUNT 43**
**(Violation of Connecticut Unfair and Deceptive Trade Practices Act)**
**(TVMLC)**

542.   Plaintiff incorporates by reference Paragraphs 1-541 as if fully stated herein.

543.   TVMLC engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*

544.   TMLC knew or should have known its conduct violated Conn. Gen. Stat. § 42-110b.

545.   As a direct and proximate result of TVMLC's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to punitive damages, together with a reasonable attorney's fee and costs.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**COUNT 44**
**(Violation of Connecticut Unfair and Deceptive Trade Practices Act)**
**(DiMA)**

546.     Plaintiff incorporates by reference Paragraphs 1-545 as if fully stated herein.

547.     DiMA engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*

548.     DiMA knew or should have known its conduct violated Conn. Gen. Stat. § 42-110b.

549.     As a direct and proximate result of DiMA's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to punitive damages, together with a reasonable attorney's fee and costs.

**COUNT 45**
**(Violation of Connecticut Unfair and Deceptive Trade Practices Act)**
**(NRBMLC)**

550.     Plaintiff incorporates by reference Paragraphs 1-549 as if fully stated herein.

551.     DiMA engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*

552.     DiMA knew or should have known its conduct violated Conn. Gen. Stat. § 42-110b.

553.     As a direct and proximate result of DiMA's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to punitive damages, together with a reasonable attorney's fee and costs.

**COUNT 46**
**(Violation of Connecticut Unfair and Deceptive Trade Practices Act)**
**(WineAmerica)**

554.     Plaintiff incorporates by reference Paragraphs 1-553 as if fully stated herein.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 •TRUMBULL, CT •06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

555.    WineAmerica engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*

556.    WineAmerica knew or should have known its conduct violated Conn. Gen. Stat. § 42-110b.

557.    As a direct and proximate result of WineAmerica's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to punitive damages, together with a reasonable attorney's fee and costs.

**COUNT 47**
**(Violation of Connecticut Unfair and Deceptive Trade Practices Act)**
**(iHeartMedia and Connoisseur Media)**

558.    Plaintiff incorporates by reference Paragraphs 1-557 as if fully stated herein.

559.    iHeartMedia and Connoisseur Media engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.*

560.    iHeartMedia and Connoisseur Media knew or should have known their conduct violated Conn. Gen. Stat. § 42-110b.

561.    As a direct and proximate result of iHeartMedia's and Connoisseur Media's unlawful conduct, PMR has suffered damages in an amount to be proved at trial and is also entitled to punitive damages, together with a reasonable attorney's fee and costs.

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Pro Music Rights, LLC hereby demands judgment in its favor and against each of the Defendants as follows:

1.      Adjudge and declare that defendants and their co-conspirators have engaged in unlawful conduct in violation of Section 1 of the Sherman Act;

2.      Adjudge and declare that defendants and their co-conspirators have engaged in unlawful conduct in violation of Section 2 of the Sherman Act;

3.      Adjudge and declare that defendants and their co-conspirators have engaged in unlawful conduct in violation of Section 35-26 of Connecticut Antitrust Act;

4.      Adjudge and declare that defendants and their co-conspirators have engaged in unlawful conduct in violation of Section 35-28 of Connecticut Antitrust Act;

5.      Adjudge and declare that defendants and their co-conspirators have engaged in unlawful conduct in violation of the Connecticut Unfair Trade Practices Act;

6.      Preliminarily and permanently enjoin defendants and their co-conspirators from establishing any unlawful agreement unreasonably restricting competition in violation of the Sherman Act and the Connecticut Antitrust Act;

7.      Adjudge and declare that defendants and their co-conspirators shall not publicly perform musical works in Pro Music Rights, LLC's repertory without first obtaining a license to publicly perform such musical works;

8.      Grant such other and further relief as the Court may deem just and proper to redress and prevent recurrence of the alleged violations and to dissipate the anticompetitive effects of the illegal agreements entered into by the defendants and its co-conspirators;

9.      Award Pro Music Rights, LLC's damages in an amount to be determined at trial, to be trebled with prejudgment and postjudgment interest and costs of this suit, including attorneys' fees and punitive damages under applicable federal and state law;

10.      Awarded such other and further relief as the Court deems just and proper.

Dated: March 9, 2020                                    Respectfully submitted,

                                                        GORA LLC

                                                        /s/ Richard S. Gora
                                                        Richard S. Gora
                                                        Sinead Rafferty
                                                        Gora LLC
                                                        2 Corporate Dr., Suite 210
                                                        Trumbull, CT 06611
                                                        rich@goralaw.com
                                                        sinead@goralaw.com
                                                        203-424-8021

                                                        **COUNSEL FOR THE PLAINTIFF
                                                        PRO MUSIC RIGHTS, LLC**

# SCHEDULE 1

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

1.      **Best New Artists Grammy Pre-Party**

      i.      February 9, 2017,  Belasco Theater, Los Angeles, CA
      ii.     January 25, 2018, Skylight Clarkson, New York, NY
      iii.    February 7, 2019, Hammer Museum, Los Angeles, CA
      iv.     February 10, 2019, 61st Annual Grammy Awards

2.      **RapCaviar Concert Series**

      i.      August 12, 2017, Atlanta, GA
      ii.     September 28, 2017, Toronto, Canada
      iii.    March 27, 2018, Los Angeles, CA
      iv.     May 1, 2018, Charlotte, NC
      v.      May 3, 2018, Southaven, MS
      vi.     May 19, 2018, Penn's Landing, PA
      vii.    April 5, 2019, Minneapolis, MN
      viii.   September 29, 2019, Brooklyn, NY
      ix.     October 25, 2019, Miami, FL
      x.      October 29, 2019, Toronto, Canada
      xi.     November 29, 2019, Dallas, TX

3.      **RapCaviar Live 2019, Panel Event Miami**

      i.      October 23, 2019,

4.      **Hot Country Live Concert**

      i.      July 4, 2018, NYC's Pier 17

5.      **Florida Georgia Line Album Celebration by Spotify's Hot country Live**

      i.      February 19, 2019, Los Angeles

6.      **Pandora Live Concert Series**

      i.      December 10, 2019, Brooklyn, NY

7.      **PandoraSXSW**

      i.      March 11-16, 2017, Austin, TX
      ii.     March 13-15, 2018, Austin, TX

8.      **Pandora Sounds like You**

      i.      New York → July 19, 2017, Brooklyn, NY

GORA LLC
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

ii.    Country Special → November 3, 2017, Nashville, TN
iii.    Summer → July 29, 2017, Los Angeles, CA
iv.    Hip Hop → December 5, 2018, New York, NY

**9.    Pandora Sounds Like Country Concert**

i.    June 6, 2017, Nashville, TN

**10.    Pandora Live at Marathon Music Works**

i.    June 5, 2018, Nashville, TN
ii.    June 3, 2019, Nashville, TN

**11.    Pandora Beyond Concert**

i.    November 13, 2018, New York, NY

**12.    PAX**

i.    January 27-29, 2017, San Antonio, TX
ii.    March 10-12, 2017, Boston, MA
iii.    October 27-29, 2017, Melbourne, Australia
iv.    January 12-14, 2018, San Antonio, TX
v.    April 5-8, 2018, Boston, MA
vi.    September 2018, Seattle, WA
vii.    October 26-28, 2018, Melbourne, Australia
viii.    January 18-20, 2019, San Antonio, TX
ix.    March 28-31, 2019, Boston, MA
x.    August 30 – September 2, 2019, Seattle, WA
xi.    October 2019, Melbourne, Australia

**13.    VidCon**

i.    Anaheim → June 21-24, 2017, Anaheim, CA
ii.    Europe → April 8-9, 2017, Amsterdam, Netherlands
iii.    Australia → September 9-10, 2017, Melbourne, Australia
iv.    Anaheim → June 20-23, 2018, Anaheim, CA
v.    Europe → March 22-24, 2018, Amsterdam, Netherlands
vi.    Australia→ September 1-2, 2018, Melbourne, Australia
vii.    Anaheim → July 11-13, 2019, Anaheim, CA
viii.    Europe → February 14-17, 2019, Amsterdam, Netherlands
ix.    Australia → August – September 2019, Melbourne, Australia

**14.    Playlist Live**

**GORA LLC**
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

i.     September 21-22, 2018, Secaucus, NJ
ii.    April 27-29, 2018, Orlando, FL
iii.   March 1-3, 2019, Orlando, FL

**15.    Influence This Creator Meet Up**

i.     March 19, 2019, Toronto, Canada

**16.    Social Media Marketing World**

i.     March 20-22, 2019, San Diego, CA

**17.    BeautyCon**

i.     May 20, 2017,  New York, NY
ii.    April 21-22, 2018, New York, NY
iii.   April 6-7, 2019, New York, NY
iv.    August 8, 2017,  Los Angeles, CA
v.     July 14-15, 2018, Los Angeles, CA
vi.    August 10-11, 2019, Los Angeles, CA

**18.    NAB**

i.     April 22-24, 2017,  Las Vegas, NV
ii.    April 7-12, 2018, Las Vegas, NV
iii.   April 8-11, 2019, Las Vegas, NV

**19.    BrightCover Play**

i.     May 14-16, 2019, Boston, MA

**20.    Buffer Festival**

i.     September 28-October 1, 2017, Canada
ii.    September 27-30, 2018, Toronto, Canada
iii.   May 17, 2018, Los Angeles, CA
iv.    May 2019, Los Angeles, CA
v.     October 4-6, 2019, Canada

**21.    E3**

i.     June 13-15, 2017, Los Angeles, CA
ii.    June 12-14, 2018, Los Angeles, CA
iii.   June 11-13, 2019, Los Angeles, CA

GORA LLC
2 CORPORATE DR., SUITE 210 •TRUMBULL, CT •06611 •203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

22.     **Summer in the City**

    i.   August 4-6, 2017, London, England
    ii.  August 10-12, 2018, London, England
    iii. August 9-11, 2019, London, England

23.     **Content Marketing World**

    i.   September 6-8, 2017, Cleveland, OH
    ii.  September 4-7, 2018, Cleveland, OH
    iii. September 3-6, 2019, Cleveland, OH

24.     **CVX Live**

    i.   August 3-5, 2017, Salt Lake City, UT
    ii.  September 21-22, 2018, Provo, UT
    iii. September 2019, Provo, UT

25.     **VidSummit**

    i.   October 10-11, 2017, Los Angeles, CA
    ii.  October 9-12, 2018, Los Angeles, CA
    iii. October 15-17, 2019, Los Angeles, CA

26.     **Adobe Max**

    i.   October 18-20, 2017, Las Vegas, NV
    ii.  October 15-17, 2018, Las Vegas, NC
    iii. October 19-21, 2019, Los Angeles, CA

27.     **TwitchCon**

    i.   October 20-22, 2017, California
    ii.  October 26-28, 2018, San Jose, CA
    iii. September 27-29, 2019, San Diego, CA

28.     **VidTalks 2018**

    i.   April 18, 2018, Vancouver, Canada

29.     **VideoDays**

    ii.  August 11-12, 2018, Cologne, Germany

    iii.   June 16-17, 2018, Berlin, Germany

**30.**    **Google I/O**

    i.   May 17-19, 2017, Mountain View, CA
    ii.   May 8-10, 2018, Mountain View, CA
    iii.   May 7-9, 2019, Mountain View, CA

**31.**    **Google Cloud Next**

    i.   May 3-4, 2017, London, England
    ii.   March 8-10, 2017, San Francisco, CA
    iii.   September 19-20, 2018, Tokyo, Japan
    iv.   October 10-11, 2018, London, England
    v.   November 19-21, 2019, London, England
    vi.   April 9-11, 2019, San Francisco, CA

**32.**    **Google Cloud Summit**

    i.   July 18, 2017, New York, NY
    ii.   September 13, 2017, Seattle, WA
    iii.   October 5, 2018, Toronto, Canada
    iv.   September 26, 2018, Sydney, Australia
    v.   September 20, 2018, New York, NY
    vi.   September 13, 2018, Singapore
    vii.   October 10, 2018, Hong Kong
    viii.   July 17-18, 2019, Chicago, IL
    ix.   September 18, 2019, Sydney, Australia
    x.   September 17, 2019, Seattle, WA

**33.**    **Microsoft Build**

    i.   May 10-12, 2017, Seattle, WA
    ii.   May 7-9, 2018, Seattle, WA
    iii.   May 6-8, 2019, Seattle, WA

**34.**    **Microsoft Business Applications Summit**

    i.   June 10-11, 2019, Atlanta, GA

**35.**    **Microsoft Inspire**

    i.   July 9-13, 2017, Washington, D.C.

    ii.   July 15-19, 2018, Las Vegas, NV
   iii.   July 14-18, 2019, Las Vegas, NV

**36.    Microsoft Ignite**

     i.   September 24-29, 2017, Orlando, FL
    ii.   September 24-28 Orlando, FL
   iii.   November 4-8, 2019, Orlando, FL

**37.    Microsoft Cloud Workshop: Azure Cosmos DB Hands On Workshop**

     i.   January 14, 2019, San Francisco, CA

**38.    Microsoft Leap for the Future Program**

     i.   January 28-February 1, 2019, Redmond, WA

**39.    MVP Global Summit**

     i.   March 4-7, 2018, Redmond, WA
    ii.   March 17-22, 2019, Bellevue and Redmond, WA

**40.    The Prosper Show**

     i.   March 21-23, 2017, Las Vegas, NV
    ii.   March 13-14, 2018, Las Vegas, NV
   iii.   March 17-19, 2019, Las Vegas, NV

**41.    AWS Global Summit Program**

     i.   August 14, 2017, New York, NY
    ii.   July 18, 2018, New York, NY
   iii.   July 11, 2019, New York, NY
   iv.   May 30, 2019, Chicago, IL
    v.   August 23, 2018, Anaheim, CA
   vi.   April 11, 2019, Anaheim, CA
   vii.   May 2, 2019, Atlanta, GA

**42.    Amazon World Expo**

     i.   March 6-7, 2018, Germany
    ii.   March 12-13, 2019, Munich, Germany

**GORA LLC**
2 CORPORATE DR., SUITE 210 • TRUMBULL, CT • 06611 • 203.424.8021 • RICH@GORALAW.COM
WWW.GORALAW.COM

43. **SellerCon**

    i. April 6-8, 2018, Orlando, FL
   ii. June 21-23, 2019, Las Vegas, NV

44. **Midwest E-Com Conference**

    i. July 21-22, 2017, Minneapolis, MN
   ii. July 20-21, 2018, Minneapolis, MN
  iii. July 19-20, 2019, Minneapolis, MN

45. **ShopTalk**

    i. March 3-6, 2019, Las Vegas, NV

46. **European Sellers Conference**

    i. March 28-30, 2019, Prague, Czech Republic

47. **Retail Global**

    i. September 11-15, 2017, Las Vegas, NV
   ii. October 9-11, 2018, Las Vegas, NV
  iii. October 9-11, 2019, Las Vegas, NV

48. **Apple Special Events**

    i. October 30, 2018, Brooklyn, NY
   ii. June 4, 2018, San Jose, CA
  iii. June 3, 2019, San Jose, CA
  iv. iPhone 8: September 12, 2017, at the Steve Jobs Theater
   v. iPhone 11: September 10, 2019, at the Steve Jobs Theater
  vi. iPhone XS: September 12, 2018, at the Steve Jobs Theater
 vii. March 25, 2019, at the Steve Jobs Theater

49. **Apple's Worldwide Developer Conference**

    i. June 5-9, 2017, San Jose, CA
   ii. June 4-8, 2018, San Jose, CA
  iii. June 3-7, 2019, San Jose, CA

50. **Best of 2019, App Awards**

i.   December 2, 2019, New York, NY

**51.**   **Apple Music Awards**

i.   December 4, 2019, Steve Jobs Theater in Cupertino, CA