## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

PRO MUSIC RIGHTS, LLC,
　　　　*Plaintiff*,

　　　v.　　　　　　　　　　　　　　　　　　No. 3:20-cv-00309 (JAM)

APPLE, INC. *et al.*,
　　　　*Defendants.*

## ORDER GRANTING MOTION TO DISMISS

Plaintiff Pro Music Rights, LLC ("PMR") has filed this antitrust lawsuit against more than two dozen music industry defendants including major music streaming providers and organizations that negotiate musical performance (or "play") licenses for radio and television providers and wineries. The complaint alleges scores of violations of the Sherman Act, the Connecticut Antitrust Act, and the Connecticut Unfair Trade Practices Act. Twelve of the defendants now move to dismiss for failure to state a claim upon which relief can be granted. Because I agree that PMR's complaint does not contain factual allegations that plausibly state a claim, I will grant the motion to dismiss.

### BACKGROUND

PMR initially named 25 defendants, although eight of the initial defendants have been voluntarily dismissed with prejudice and others have yet to be served. *See* Docs. #130 at 1; #147 at 10 n.2; #172. The remaining defendants include the following eight "streaming defendants":

- Apple, Inc.;
- Amazon.com, Inc;
- Google, LLC;
- YouTube, LLC;
- Spotify USA, Inc.;
- Deezer Inc.;
- Pandora Media, LLC; and

1

- SoundCloud Inc.

Doc. # 1 at 32 (¶ 140). In addition, there are four "group" defendants that PMR labels "Cartel

Coordinators":

- The Television Music License Company, LLC ("TVMLC"), which represents some 1,200 commercial television stations in licensing negotiations;

- The National Religious Broadcasters Music License Company ("NRBMLC"), which represents more than 1,000 AM and FM radio stations in licensing negotiations;

- The Digital Media Association ("DiMA"), which represents 25 members, including all of the streaming defendants except Deezer and SoundCloud, in licensing negotiations; and

- The National Association of American Wineries ("WineAmerica"), which represents 500 wineries in licensing negotiations.

*Id.* at 20-23, 32 (¶¶ 66-67, 70-71, 77, 81-82, 142).

The following facts are set forth in the light most favorable to plaintiff PMR as the non-moving party. PMR is a performance rights organization ("PRO"), which licenses performers' musical works, charges buyers a periodic fee for the license to publicly perform the music in its library, and passes along the royalties to the performers that own the copyright to the music. *Id.* at 4 (¶ 1). PMR has developed a sizable library of works to license, but none of the defendants—who together "have complete control of the buyers' market"—have purchased PMR's licensed works or even negotiated with it in good faith. *Id.* at 5 (¶¶ 2-3). According to PMR, this is due to "Defendants' conspiracy and anticompetitive agreement," which constitutes "an illegal monopsony." *Id.* at 5 (¶ 4).

PMR alleges a longstanding "sell-side" setup: the two largest PROs—the American Society of Composers, Authors, and Publishers ("ASCAP") and Broadcast Music, Inc. ("BMI")—are subject to consent decrees with the Department of Justice ("DOJ") and rate-setting agreements, all of which are highly favorable to the defendants by allowing them to secure

licenses for low prices. *Id.* at 7-10 (¶¶ 10-11). "The consent decrees force a contrived and restrictive licensing system that produces below-market rates and imposes a court-administered rate-setting process in the rate court that is unresponsive to market forces and unable to consider all relevant data." *Id.* at 35 (¶ 157).

To maintain this favorable status quo and "two-stop shopping," defendants have used a variety of aggressive tactics against PMR and two other relatively new PROs—Global Music Rights, LLC ("GMR") and SESAC, LLC—including refusal to negotiate with them or acknowledge them as legitimate sellers, agreeing to boycott PMR, disseminating strategic propaganda, supporting the existing consent decrees through comments to DOJ and other tactics, engaging in outright copyright infringement, and generally trying to force PMR to "giv[e] up or shut[] down." *Id.* at 6-11 (¶¶ 6, 9, 10, 12, 16, 17). The defendants purchase licenses from GMR and SESAC because they have "must have" catalogs, although some of the defendants have filed antitrust lawsuits against those two PROs. *See, e.g.*, *id*. at 15, 55 (¶¶ 34, 252-53).

PMR alleges defendants "belong to a web of different trade associations and participate in various meetings, forums, conferences, private meetings and industry conventions, all of which provide forums at which they can collude to formulate their anticompetitive agreements" and that defendants have "teleconference and email discussions … discussing, refining and entering into the anticompetitive agreement." *Id*. at 66-67 (¶¶ 299, 302). PMR also lists many music industry events held over the years at which "representative[s] and executives of the Cartel members met, or had the opportunity to meet, in person … where they discussed the Cartel's anticompetitive agreement and refusal to deal with emerging PROs, including, in certain instances, PMR." *Id.* at 67 (¶ 302).

In addition to the trade associations that are "group" defendants, DiMa, TVMLC, and WineAmerica in turn are members of the Music Innovation Consumers ("MIC") Coalition, which has about 15 members who provide information about licensing laws and issue "propaganda" about PROs, sometimes using the same language as other defendants in statements criticizing PROs that are not covered by a consent decree. *Id.* at 59, 61-63 (¶¶ 265-66, 275-76, 278, 282-83). In a phone call with PMR in December 2019, NRBMLC stated that its discussion was not a negotiation and asked whether PMR had entered into other licensing agreements with other unspecified "Cartel" members. *Id.* at 66 (¶ 298).

PMR alleges that due to defendants' tactics, it has not been able to sell defendants its licenses at an acceptable price even though PMR estimates that it controls 7.4 percent of the market for public performance rights, behind only ASCAP and BMI. *Id.* at 11, 13 (¶¶ 16-17, 24). This is against defendants' self-interest, because defendants are foregoing an opportunity to have the exclusive license to PMR's catalog, which may contain hit songs. *Id.* at 51-52 (¶¶ 242-43).

PMR filed this lawsuit in March 2020. In August 2020, the 12 remaining defendants moved to dismiss PMR's complaint for failure to state a claim and to stay discovery until the resolution of the motion to dismiss. Docs. #146-149. In September 2020, I granted defendants' motion to stay discovery pending resolution of their motion to dismiss, finding that defendants raised at least substantial arguments for dismissal and that the other relevant factors weighed in favor of staying discovery. Doc. #164. PMR has since filed its opposition to defendants' motion to dismiss, Doc. #168, and defendants filed a reply, Doc. #173. I heard oral argument from counsel on December 10, 2020, and this ruling now follows.

## DISCUSSION

When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless the facts it recites are enough to state plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Hernandez v. United States*, 939 F.3d 191, 198 (2d Cir. 2019). The "plausibility" requirement is "not akin to a probability requirement," but it "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. The Court need not accept statements that couch legal conclusions in the form of factual allegations or that are otherwise conclusory. *See Hernandez*, 939 F.3d at 198.

The 47 counts of the complaint can be grouped into three categories: claims of a conspiracy in violation of § 1 of the Sherman Act; claims of monopsonization or attempted monopsonization in violation of § 2 of the Sherman Act; and parallel claims under Connecticut state law.[1] I will address each category of claims and the asserted grounds for dismissal in turn.

### Section 1 claims

The first 14 counts of PMR's complaint allege that defendants violated § 1 of the Sherman Act by engaging in horizontal price-fixing and a group boycott of PMR. Doc. #1 at 70-86. Defendants argue that PMR's complaint does not contain factual allegations sufficient to allege a plausible conspiracy in violation of § 1. Doc. #147 at 16-31.

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of

---

[1] As an initial matter, Counts 2, 7, 9, 14, 16, 22, 28, 33, 35, 40, 42, and 47 do not state a plausible claim because they allege claims only against defendants iHeartMedia, Inc., Connoisseur Media LLC, and/or RMLC, which have each been voluntarily dismissed with prejudice. *See* Docs. #112; #140; #172.

trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (cleaned up). "[P]roof of joint or concerted action is required; proof of unilateral action does not suffice." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 781 (2d Cir. 2016) (cleaned up). In order to survive a motion to dismiss under Rule 12(b)(6), a § 1 claim must have "enough factual matter (taken as true) to suggest that an agreement was made[,]" which "requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 540 U.S. at 555-56.

PMR acknowledges that it has not alleged direct evidence of a conspiracy, but argues that it can use circumstantial evidence to support its claims and defeat the motion to dismiss. Doc. #168 at 18-20.[2] That is correct: because "conspiracies are rarely evidenced by explicit agreements," they "nearly always must be proven through inferences that may fairly be drawn from the behavior of the alleged conspirators[.]" *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) (internal quotation omitted). But as the Supreme Court made clear in *Twombly*, "when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." 550 U.S. at 557. "Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 556-57.

---

[2] Though PMR also argues that it alleges a *per se* conspiracy, Doc. #168 at 34-37, its argument is confused and suggests that a plaintiff can claim a *per se* conspiracy simply by reciting the essential elements of a conspiracy. But PMR cannot circumvent the plausibility pleading standard simply by labeling its allegations a *per se* conspiracy.

"[I]n the absence of direct 'smoking gun' evidence, a horizontal agreement …  may be inferred on the basis of conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (cleaned up). These "plus factors" include, but are not limited to, "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." *Ibid*. The allegations of these factors "must still lead to an inference of a conspiracy[,]" suggesting "parallel conduct flowed from a preceding agreement rather than from [defendants'] own business priorities." *Id*. at 137-138.

Here, PMR has not plausibly alleged consciously parallel conduct. PMR argues that its complaint has alleged parallel conduct mainly because none of the defendants have "engaged in any legitimate negotiation with respect to a license with PMR," and they have otherwise refused to deal with PMR. Doc. #168 at 22. But "as a general matter, the Sherman Act does not restrict the long recognized right of a trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (cleaned up). This means the fact that none of the defendants have chosen to do business with PMR does not show that this refusal to deal is because of any illicit understanding among the defendants.

Moreover, PMR itself alleges facts that tend to suggest wholly innocent reasons for defendants to decline to do business with PMR. It admits that not doing business with PMR was in defendants' individual economic self-interest because the "potential cost of dealing with PMR outweighs the potential benefits" and would constitute "Armageddon." Doc. #168 at 27-28. As PMR alleges, defendants maintain the benefit of "two-stop shopping," such that they "need to

7

obtain only two Licenses, one from BMI and one from ASCAP," and "[w]henever a new PRO enters the market … Defendants are subject to an additional cost" because they "must obtain another License." Doc. #1 at 9 (¶ 10).

But if defendants do indeed benefit from such a "two-stop shopping" regime, this is a benefit that each and every one of the defendants has an individual self-interest in pursuing on its own to reduce its individual transactions costs and apart from any benefit that defendants might derive by means of illegal collective action. In other words, PMR's allegations suggest a strong *independent* rationale for defendants' individual refusal to deal with PMR strictly for reasons of individual self-interest. Accordingly, defendants' alleged refusal to negotiate or deal with PMR does not, on its own, plausibly establish interdependent or conscious parallel conduct.

Nor do the other allegations plausibly establish consciously parallel conduct. PMR argues that the "Streaming Defendants peddled nearly verbatim excuses and language to PMR" about why they did not want to negotiate a license. Doc. #168 at 22. But the referenced allegations in the complaint describe several alleged excuses, including that negotiating a license would cost too much in legal fees, that the license fee was not aligned with the rate court fee, and that the royalty rate was higher than what BMI and ASCAP charge. Doc. #1 at 48 (¶ 227). These rationales are at least somewhat distinct from one another, undermining PMR's assertion that the excuses were verbatim, and PMR's allegation that they were "choreographed" is conclusory as it does not detail which defendants gave which responses or any other facts to suggest the responses were choreographed. Moreover, the "choreographed" reasons alleged by PMR for defendants' refusal to do business with PMR are for facially valid reasons of saving costs and are as consistent with each defendant's individual and independent self-interest as they are with a plan for defendants to act collectively in declining to do business with PMR.

PMR also alleges that each defendant "asked PMR about the existence of negotiation with other Defendants" and "used this information to interfere with other pending negotiations by misrepresenting the status and content of their engagement and negotiations with PMR." Doc. #168 at 22. But the referenced allegations in the complaint—that defendants "mined PMR" for information, "used this information to interfere with other pending negotiations," and "obfuscated the substance of their discussions with PMR"—are conclusory and lack any specificity about the conversations and defendants' alleged behavior. Doc. #1 at 67-68 (¶¶ 304, 307).

Furthermore, it is unclear how any inference of interdependence could be drawn from PMR's allegation that the streaming defendants each responded that they would take down the musical works after PMR sent copyright cease and desist letters. Doc. #168 at 22. The only factual allegation that could perhaps raise an inference of *conscious* parallelism, or *interdependent* conduct, is the allegation that NRBMLC inquired about whether PMR entered into other licensing agreements during a December 2019 teleconference, and even that allegation lacks any further specifics, such as which specific "Cartel" members NRBMLC asked about or what it did with that information. Doc #1 at 66 (¶ 298).

All in all, PMR's allegations do not plausibly show "conscious parallelism" because, with the possible exception of its allegation as to NRBMLC, PMR does not allege non-conclusory facts showing that defendants' actions with respect to PMR were done in a manner to "recognize their shared economic interest and their interdependence with respect to price and output decisions." *Twombly*, 550 U.S. at 553; *see also Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (affirming dismissal of Sherman Act claim when "[o]n the first element – tacit agreement – appellants allege mere parallel conduct, and lack indicia of mutuality or

otherwise interdependent action"). Accordingly, PMR has not plausibly alleged that defendants engaged in consciously parallel or interdependent conduct to begin to establish a plausible illegal conspiracy.

Even assuming that PMR has properly alleged consciously parallel conduct, however, it has not adequately alleged a plus factor or other circumstantial evidence to make a plausible showing of an antitrust conspiracy. PMR argues that its complaint includes at least six plus factors.

First, PMR argues that the unique structure of the buy-side of the public performance rights market is conducive to collusion and a "fertile area for harmful collusive behavior by buyers." Doc. #168 at 27. Under PMR's argument, the entry of PMR and other PROs into the market "may result in Armageddon for the Cartel: numerous competitors in the sell-side of the market and hundreds of PROs not subject to consent decrees are in the market, copyright holders leave BMI and ASCAP in droves for those other PROs, and the Cartel must secure Licenses from those hundreds of PROs to publicly perform musical works." *Ibid.* (citing Doc. #1 at 53 (¶ 246)). Additionally, TVMLC has stated publicly that "the music licensing marketplace is unquestionably harmed by the fact that there are PROs that are not subject to Consent Decrees[,]" and a defendant that has been voluntarily dismissed with prejudice, Radio Music License Committee, Inc. ("RMLC"), has stated that the entry of a different PRO into the marketplace "complicated" the music licensing landscape. *Id.* at 27-28.

But these allegations do nothing to make it more likely that the defendants' decisions "flowed from a preceding agreement rather than from their own business priorities." *Citigroup*, 709 F.3d at 138. Faced with the so-called "Armageddon," a decision to refrain from dealing with new PROs is arguably "not just *a* rational business decision, but the *only* rational business

decision." *Ibid.* (emphasis in original). And "parallel behavior that does not result from an agreement is not unlawful even if it is anticompetitive." *United States v. Apple, Inc*., 791 F.3d 290, 315 (2d Cir. 2015). Accordingly, the structure of the buy-side of the public performance rights market does not constitute a plus factor or circumstantial evidence in PMR's favor.

Second, PMR argues that defendants have shared common motives to conspire because "two-stop shopping" at BMI and ASCAP favors defendants, "[t]he potential cost of dealing with PMR outweighs the potential benefits," and defendants are "jointly motivated by a desire to maximize profits by keeping royalty rates low." Doc. #168 at 28. PMR is correct that a "motive to conspire may be inferred where the parallel action taken by defendants had the effect of creating a likelihood of increased profits." *Ibid.* (citing *In re Commodity Exchange, Inc.*, 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016) (cleaned up)). But "courts may not infer a conspiracy where the defendants have no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations." *In re Commodity Exchange*, 213 F. Supp. 3d at 662 (quoting *Ross v. Am Exp. Co.*, 35 F. Supp. 3d 407, 442 (S.D.N.Y. 2014)); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 112 (2d Cir. 2018) (noting that "motive to conspire tends to be negated (1) when a defendant shows that the alleged agreement would harm the alleged conspirators; or (2) when the defendant shows a plausible and justifiable reason for its conduct that is consistent with proper business practice") (cleaned up).

Here, as noted above, PMR's allegations give rise to a plainly logical explanation that it is in defendants' individual and independent economic interests not to buy PMR's higher-priced licenses—and more generally to maintain the current PRO market structure. *See ibid.* ("it made perfect business sense for the defendants to constantly monitor industry conditions during the short-term period given by Anderson to consider its ultimatum, before ultimately deciding to

11

independently reject Anderson's higher-cost proposal in favor of lower-cost alternatives");
*Citigroup*, 709 F.3d at 139 (noting that "a common motive" such as "to cut losses" is
"insufficient to support the inference of conspiracy"). Moreover, PMR provides no factual
support to make plausible its conclusory allegations that "[w]hen a Cartel traitor secures a
License from PMR resulting in a hit song, the other Cartel members are forced to secure a
license from PMR in order to remain competitive." Doc. #168 at 28. Accordingly, PMR has not
plausibly alleged the plus factor of common motive to conspire.

Third, PMR alleges that defendants acted against their own self-interest in undertaking
their alleged anticompetitive agreement. *Id*. at 29. Not only does this argument conflict with
PMR's other argument that doing business with PMR would raise defendants' costs, but it is
entirely speculative. PMR's argument is that each defendant "can continue to purchase licenses
at infracompetitive levels only if the other Cartel members do not cheat on the agreement by
engaging in licensing deals with PMR" and that, absent a conspiracy, the defendants would each
have an individual incentive to do business with PMR because, if PMR's repertory contains new
hit songs, a defendant would then have exclusive rights to play that song. *Id*. at 29-30; Doc. #1 at
51-52 (¶¶ 240-44). But PMR does not provide any factual support for this theory, such as any
evidence that its repository contains any potential hit records to which defendants would
otherwise not have legal access. And PMR's argument is also contradicted by the allegations in
its complaint that defendants have entered into negotiations and licenses with GMR and SESAC,
which own "must-have" catalogs. *See, e.g.*, Doc. #1 at 15, 55 (¶¶ 34, 252-53).

In addition, PMR argues that defendants acted against their interest because their
"concerted activity results in copyright infringement," exposing them to civil and criminal
penalties. Doc. #168 at 22 n.6. But PMR has not alleged a copyright infringement cause of

action, and there is no factual basis to consider or credit these conclusory allegations. Overall, despite PMR's insistence that it "makes no sense" for defendants not to enter into licensing agreements with it, PMR has not made a plausible showing that not doing so was against defendants' individual and independent self-interest.

Fourth, PMR alleges that defendants have a high level of interfirm communications because they "belong to a web of different trade associations and participate in various meetings, forums, conferences, private meetings and industry conventions, all of which provide forums at which they can collude to formulate their anticompetitive agreements." *Id.* at 31-32. But the complaint does not allege particulars and alleges only that some defendants had "substantial *opportunities* to communicate and collude" and certain "forums provide the Cartel with *ample opportunity* to meet, devise and implement a host of anticompetitive schemes that unreasonably restrain competition." Doc. #1 at 66-67 (¶¶ 299-302) (emphasis added). The Second Circuit has made clear that "the mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred," and "although the nature of trade associations is such that they are frequently the object of antitrust scrutiny, every action by a trade association is not concerted action by the association's members." *Gamm*, 944 F.3d at 466 (cleaned up); *see also Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 301 n.4 (E.D.N.Y. 2017) (Bianco, J.) (noting that a "defendant's membership in a trade association hardly renders plausible the conclusion that entity and certain other members are functioning as an ongoing, organized, structured enterprise in conducting their business").

Elsewhere, PMR claims "the existence of teleconference and e-mail discussions among the Cartel members discussing, refining and entering into the anticompetitive agreement." Doc. #168 at 14 (citing Doc. #1 at 67 (¶ 302)). Although the complaint includes a long list of music

industry events held over the years, it does not identify any of the defendants who attended those events or in what capacity they attended. Doc. #1 at 67 (¶ 302), 113-120. It also alleges that dismissed-defendant RMLC communicated daily with its members and unnamed defendants. *Id*. at 42 (¶ 195).

PMR's allegations of discussions are purely speculative and do not allege that any current defendant actually ever discussed PMR with any other defendant. These allegations are a far cry from cases in which courts have found high levels of interfirm communications to be a plus factor that made an alleged agreement plausible. *See, e.g.*, *Gelboim*, 823 F.3d at 782 n.19 (reciting complaint allegations that "a November 29, 2007 email shows that Barclays knew, in advance of the submission deadline, the proposed confidential submissions of every USD LIBOR panel bank"); *Miami Prod. & Chem. Co. v. Olin Corp.*, 449 F. Supp. 3d 136, 169 (W.D.N.Y. 2020) ("While the instant matter may present a closer case than that in *Gelboim* due to the absence of a 'smoking gun' showing interfirm communications … the Amended Complaint's allegations that Westlake privately announced unprecedented similar price increases to those of the private announcements of other Defendants after attending trade association meetings with those Defendants are still sufficient to make Plaintiffs' conspiracy allegations plausible"); *Iowa Pub. Employees' Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 322 (S.D.N.Y. 2018) (plaintiff plausibly alleged "multiple interfirm meetings at conferences, private dinners, and EquiLend board meetings, including the 2009 meeting convened by Bank of America"; "meetings between Wipf and Conley"; "a 2009 meeting between Bank of America and Goldman Sachs executives"; "meetings between Morgan Stanley, Goldman Sachs, and other Defendants at private dinners and conferences"; and "meetings of

EquiLend's Board"). Accordingly, PMR has not plausibly alleged a high level of interfirm communications sufficient to satisfy this plus factor.

Fifth, PMR argues that antitrust litigation brought against GMR and SESAC suggests that defendants have for years "been relentlessly carrying out their illegal agreement to choke all vestiges of legitimate competition from the buy-side of the market." Doc. #168 at 32-33. This argument strains credulity, because the plaintiffs in those cases are no longer defendants in this action after RMLC was dismissed, and because those lawsuits allege that it was GMR and SESAC who engaged in anticompetitive abuses. In one case, the court found the "evidence would also comfortably sustain a finding that SESAC … engaged in an overall anti-competitive course of conduct designed to eliminate meaningful competition to its blanket license." *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 196 (S.D.N.Y. 2014).

Moreover, the *Noerr-Pennington* doctrine generally prevents the filing of litigation to be considered as evidence of an antitrust conspiracy. Although there is an exception for "sham" lawsuits, the apparently strong grounds for claims against the other PROs belies any invocation of the sham exception here. *See Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993) (to be a "sham" a "lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and "[i]f an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail").

Sixth, PMR argues that the "Defendants' lengthy and numerous pro-consent decree submissions to the DOJ about the purported evils of unregulated PROs and alternate licensing models" support an inference of conspiracy. Doc. #168 at 33. But again, under the *Noerr-Pennington* doctrine, "[t]hose who petition government for redress are generally immune from

antitrust liability" unless the petition is a sham. *Prof'l Real Estate Inv'rs*, 508 U.S. at 56; *see also Twin City Bakery Workers & Welfare Fund v. Astra Aktiebolag*, 207 F. Supp. 2d 221, 223 (S.D.N.Y. 2002) (noting that "by virtue of the right to petition guaranteed by the First Amendment, attempts to influence legislative, executive, administrative or judicial action are immune from federal antitrust liability") (citations omitted). There is no plausible factual basis to suggest that the comments were "objectively baseless," especially in light of PMR's own argument that the consent decrees provide defendants with an "incredible bargain," *id*. at 34, and insofar as PMR's argument suggests that defendants' advocacy positions were adopted.

In sum, PMR's conclusory allegations do not plausibly allege that defendants inosculated in an unlawful agreement in violation of § 1 of the Sherman Act. PMR's complaint does not plausibly allege conscious parallel behavior, nor does it plausibly allege any plus factors. Although PMR reiterates conclusory allegations about the existence of a conspiracy between defendants throughout its lengthy complaint, it does not offer factual allegations that are enough "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Rather, the behaviors PMR describes are "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id*. at 554. Accordingly, I will dismiss PMR's § 1 claims.[3]

### Section 2 claims

Counts 15 to 26 of PMR's complaint allege that defendants violated § 2 of the Sherman Act by engaging in abusive "monopsonization"—a buyer-side monopoly—or attempted monopsonization. Doc. #1 at 87-100. Defendants argue that the shared monopsony theory PMR

---

[3] As I conclude that the § 1 claims should be dismissed because PMR does not allege facts amounting to a plausible direct or circumstantial claim, I do not address defendants' separate argument that PMR's alleged conspiracy is implausible on its face. Doc. #147 at 28-31.

relies on does not state a cognizable claim, and that in any event PMR has failed to allege the essential elements of a § 2 claim. Doc. #147 at 31-37.

Section 2 of the Sherman Act provides that it is unlawful to "monopolize, or attempt to monopolize ... any part of the trade or commerce among the several States." 15 U.S.C. § 2. To establish a monopsonization claim under § 2, a plaintiff must demonstrate "the possession of monopoly power in the relevant market" and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 133 (2d Cir. 2014) (citations omitted). A plaintiff bringing an attempted monopsonization claim must establish "(1) that [the defendant] has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power" in a relevant market. *Virgin Atl. Airways Ltd. v. British Airways PLC*, 257 F.3d 256, 266 (2d Cir. 2001) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459 (1993)).

To start, PMR's monopsonization theory as pleaded in the complaint is legally invalid. PMR's § 2 claims in the complaint necessarily rely on a "shared monopsony" theory because PMR argues that defendants collectively "have complete control of the buyers' market"—not that any individual defendant has monopsony power. Doc. #1 at 5 (¶ 3). But "as the prefix 'mono' suggests … there can be only one monopolist. Section 2 does not permit a 'shared monopoly' theory." *Go New York Tours v. Gray Line New York Tours*, 2019 WL 8435369, at *2 (S.D.N.Y. 2019); *see also H.L. Hayden v. Siemens Med. Sys.*, 879 F.2d 1005, 1018 (2d Cir. 1989) (market shares "could not be aggregated to establish an attempt to monopolize in violation of Sherman Act section two").

In its opposition, PMR argues that it does not rely on a shared monopsony theory because "each Defendant, individually, has the requisite degree of market power" and because "PMR clearly defines the four relevant markets: buyers of public performance licenses in the music streaming services market, buyers of public performance licenses in the terrestrial radio station services market, buyers of public performance licenses in the commercial television station services market and buyers of public performance licenses in the winery market." Doc. #168 at 42-43. But these assertions cannot be squared with the paragraphs of PMR's complaint that PMR cites. Specifically, PMR's complaint states:

> The Cartel has conspired for the anticompetitive purpose of obtaining unlawful monopsony power within the **performing rights market** so as to eliminate competition between themselves in the acquisition of licenses from PMR and also for the anticompetitive purpose and with the effect of obtaining and maintaining the power to control the royalty rate (i.e. prices) and terms and conditions under which music would be licensed and to anti-competitively drive down the competitive rate that would otherwise be paid. They have also monopsonized and attempted to monopsonize in violation of Section 2 of the Sherman Act.
>
> **The relevant product market is the market for public performance licenses to copyrighted music by terrestrial radio stations, commercial television stations, and music streaming services**.

Doc. #1 at 72 (¶¶ 332-33) (emphasis added). The complaint defines the "performing rights market" as a single relevant market and alleges that defendants together conspired to monopsonize and attempt to monopsonize that one market, even if PMR now wishes to change its tune. Because PMR's monopsonization and attempted monopsonization counts as pleaded in the complaint clearly rely on an invalid shared monopsony theory, they are subject to dismissal for that reason alone.

Moreover, even evaluating PMR's newfound suggestion that it has alleged four separate product markets that different defendants have purportedly monopsonized or attempted to monopsonize, it is clear these claims are not plausible. Counts 15 and 21 bring these claims

against the "Streaming Defendants"—which PMR defines in the complaint to include 11 companies—for their alleged violation of § 2, presumably in the "music streaming services market." Therefore, Counts 15 and 21 necessarily depend on an invalid shared monopsonization theory.

The remaining monopsonization claims allege that four trade groups—DiMa, TVMLC, NRBMLC, and WineAmerica—each monopsonized or attempted to monopsonize their respective markets, defined now as buyers of public performance licenses in the music streaming services market, terrestrial radio station services market, commercial television station services market, and winery market. Doc. #168 at 43, 45. "For a monopoly claim to survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Chapman v. New York State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008) (citation omitted).

PMR's allegations of separate, narrow "markets" are purely conclusory. PMR alleges, for example, that TVMLC "has monopsony power over the performance rights license market for its television stations in the United States" and that "TVMLC possesses monopsony power in the relevant market and has abused and continues to abuse that power to refuse to deal with and engage in a group boycott of PMR and foreclose and exclude any new PROs from entering the market." Doc. #1 at 89-90 (¶¶ 428-29). But PMR does not allege any facts suggesting that these markets actually exist, nor does it address interchangeability and cross-elasticity of demand at all. In particular, PMR does not provide any rationale for why these different markets are independent and not interchangeable from the perspective of the sellers—the PROs—which is

the necessary inquiry to determine the relevant market in a monopsony case, just as the perspective of the buyers is the relevant inquiry in a monopoly case.

As the Second Circuit explained in *Chapman*, "the reasonable interchangeability of use between the product itself and substitutes for it determine the outer boundaries of a product market." 546 F.3d at 237 (cleaned up). As a result, the Second Circuit rejected the plaintiff's attempt to define its product market as the market for restraint training services to child care providers when the complaint did not show how that market "is any different from the larger market for restraint training services to other businesses, agencies, and organizations" to which the plaintiff also marketed its product. *Id*. at 238.

In the same manner here, PMR has not explained how the separate markets it alleges are any different from each other from the perspective of PROs seeking to license their copyrighted works. And given that the broader theory underlying PMR's lawsuit is that defendants together "have complete control of the buyers' market," that they engaged in a group boycott, and that they conspired to lock PMR out of the music licensing industry writ large, it is unlikely that PMR could offer an explanation for why the markets it alleges are not interchangeable from its perspective.

Although in general "market definition is a deeply fact-intensive inquiry and courts therefore hesitate to grant motions to dismiss for failure to plead a relevant product market, where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, … the relevant market is legally insufficient and a motion to dismiss may be granted." *Ibid*. (cleaned up). Accordingly, because PMR has not plausibly alleged a relevant product market, I will also dismiss PMR's § 2 claims.

*State law claims*

PMR's remaining claims are each brought under Connecticut state law. Counts 27 to 33 allege that the defendants violated the Connecticut Antitrust Act ("CAA"), Conn. Gen. Stat. § 35-26. Doc. #1 at 100-102. Counts 34 to 40 allege violations of a second provision of the CAA, Conn. Gen. Stat. § 35-28. *Id.* at 103-106. And counts 41 to 47 allege violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b. *Id.* at 106-109.

As defendants argue persuasively, PMR's CAA claims "mirror its federal antitrust claims and should be dismissed for the same reasons." Doc. #147 at 38. The Connecticut Supreme Court has held "Section 35–26 is substantially identical to § 1 of the Sherman Act," and in construing the CAA, "the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." *Bridgeport Harbour Place I, LLC v. Ganim*, 303 Conn. 205, 213-14 (2011). Likewise, "the Connecticut Supreme Court has ruled that section 35–28(d) merely codifies the federal case law regarding what constitutes a *per se* violation of Section 1 of the Sherman Act." *Retail Serv. Assocs. v. ConAgra Pet Prod. Co.*, 759 F. Supp. 976, 981 (D. Conn. 1991).

PMR offers no reason why its state law antitrust claims should survive even if its federal antitrust claims do not. Accordingly, I will dismiss PMR's CAA claims for the same reasons I am dismissing PMR's federal antitrust claims.

As to the CUTPA claims, the conclusion that a plaintiff has failed to state a claim under the "[CAA] does not mean that [the plaintiff] has also failed to state a claim under CUTPA." *Data Capture Sols.-Repair & Remarketing, Inc. v. Symbol Techs., Inc.*, 520 F. Supp. 2d 343, 351 (D. Conn. 2007) (discussing *Journal Publishing Co., Inc. v. Hartford Courant Co.,* 261 Conn. 673, 695 (2002)). Instead, the standard three-prong analysis applies to determine whether PMR

has stated a claim under CUTPA, namely "(1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businesspersons." *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 790 (2019) (brackets omitted).

Although PMR's claims do not necessarily rise or fall based on its antitrust claims as a matter of law, here PMR's CUTPA claims are wholly conclusory, simply stating that the defendants "engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce" in violation of CUTPA. *See, e.g.*, Doc. #1 at 106 (¶ 535). PMR has not attempted to argue that any particularized allegations in its complaint—other than the alleged violations of antitrust law that are implausible in my view—state a claim under CUTPA. Nor does PMR's complaint appear to allege any non-conclusory facts that give rise to a plausible claim that any defendants have acted unfairly, immorally, or in a way that caused substantial injury to others. Accordingly, I will also dismiss PMR's CUTPA claims.

## CONCLUSION

For the reasons set forth above, the Court GRANTS defendants' motion to dismiss (Doc. #146). This ruling is without prejudice to the filing by **January 15, 2021** of a proposed amended complaint if PMR has good faith grounds to believe its amended complaint can cure the deficiencies identified in this ruling. The Clerk of Court shall close this case if PMR does not timely file an amended complaint.

It is so ordered.

Dated at New Haven this 16th day of December 2020.

/s/***Jeffrey Alker Meyer***
Jeffrey Alker Meyer
United States District Judge